840 So.2d 806 (2003)
Nancy ELLIS, Appellant
v.
John ELLIS, Appellee.
No. 2001-CA-00713-COA.
Court of Appeals of Mississippi.
March 18, 2003.
*808 T. Swayze Alford, Oxford, for appellant.
Will R. Ford, New Albany, for appellee.
EN BANC.
CHANDLER, J., for the Court:
¶ 1. Nancy and John Ellis were divorced in 1998. The court granted physical custody of their one child to Nancy with legal custody shared between the parents. The court also established a visitation schedule. The following year, both parties petitioned for contempt and for modification of custody. The chancellor found Nancy in contempt and ordered her to pay attorney's fees and to comply with the revised visitation schedule. Feeling aggrieved by the chancellor's ruling, Nancy filed this appeal asserting the following five issues:
I. DID THE CHANCELLOR ERR IN FINDING NANCY IN CONTEMPT OF THE COURT'S VISITATION ORDER?
II. DID THE CHANCELLOR ERR IN NOT RESTRICTING JOHN'S VISITATION RIGHTS?
III. DID THE CHANCELLOR ERR IN RESTRICTING NANCY'S CONTACT WITH THE CHILD DURING THE CHILD'S VISITATION WITH JOHN?
IV. DID THE CHANCELLOR ERR IN HOLDING THAT NANCY COULD NOT SCHEDULE ANY EVENTS FOR THE CHILD DURING JOHN'S VISITATION?
V. DID THE CHANCELLOR ERR IN REFUSING TO MODIFY THE SUMMER VISITATION SCHEDULE DUE TO ITS CONFLICTING LANGUAGE?
Upon review of the record and legal precedent, we affirm as to Issues I, II, III, and IV, and remand in part as to Issue V.

FACTS
¶ 2. On October 21, 1998, John and Nancy Ellis were granted a divorce in the Union County Chancery Court on the grounds of irreconcilable differences. The judgment granted the parties joint legal custody and Nancy primary physical custody of their only child. John received certain visitation privileges, including five weeks during the summer, every other weekend and holidays on alternating years.
¶ 3. On October 25, 1999, Nancy filed a complaint for contempt stating that John had failed to pay certain bills. Nancy also moved for a modification in the visitation order. Two days later, John filed a petition for contempt asking the court to hold Nancy in contempt for her intentional and *809 repeated interference with his visitation rights. John claimed he had missed twenty days of visitation due to Nancy's interference. He moved the court to allow him to make up all missed visits and asked for attorney's fees. He further sought physical custody of the minor child.
¶ 4. John testified to several occasions where Nancy had failed to properly comply with the visitation order by failing to provide the child for visitation at the proper time or not at all. Based on this evidence, the court entered an emergency order on October 26, 1999, ordering Nancy to provide the child for weekend visitation. As required by the order, Officer Bill Long testified that he went to Nancy's home to obtain the child. Long stated that Nancy was uncooperative by refusing to disclose the child's location.
¶ 5. John also reported several incidences during his visitation time with his child that Nancy physically or telephonically interfered with the visit. He claimed that these interruptions created tension and caused the child to become upset. He testified to one occasion when visiting with the child, Nancy approached and whispered something in the child's ear. John stated that the child instantly began crying and exclaimed that she wanted to go home with her mother. Dr. Sam Pace, John's brother-in-law, stated he witnessed an incident during the Christmas holidays when Nancy telephoned the child. Pace testified that prior to the call the child was affectionate and happy; however, immediately after the call she became upset and unresponsive. He testified that this was a regular occurrence during John's visitation with his daughter.
¶ 6. John also complained of Nancy's refusal to include him in the decision making for their daughter. He testified that without his knowledge or consent Nancy removed their daughter from private school and placed her in home school. He also indicated that Nancy would refuse to disclose where the child was attending summer camp.
¶ 7. Nancy admitted that she had withheld some of John's visitation but argued that she was justified in her action. Nancy testified to the stress and trauma the child was experiencing due to the visitations. She stated that the child would beg Nancy to not force her to go and that she would cry herself to sleep at night prior to going to visit her father.
¶ 8. She presented testimony from a psychologist, Dr. Roger Bennett, who after several counseling sessions with the child concluded that she showed signs of trauma and stress. He said her condition was directly attributed to the visitations with John. He based his opinion on the child's reaction to talking about her father. On several occasions the child said she did not want to go visit John. During Dr. Bennett's sessions, he engaged the child in sentence completions which yielded the following results:
Most of all, I want not to go with my dad.

I hate I don't hate my dad but I don't really like him.

I wish I could stop going with my dad.

¶ 9. John also presented testimony from a psychologist, Dr. Joe Morris, who after assessing the child concluded that she suffered from depression and recommended she attend counseling. He said the depression was not created by the visitations with her father, but arose from the conflicts between the parents and the lack of access she had with her father. He also stated that in his opinion the child suffers from parental alienation syndrome.[1] He *810 based his opinion upon John's reports that the child shows a disregard for John while in the presence of her mother. He also stated that the child's drawings of her family in which she excludes her father from the picture is a classic sign of the syndrome.
¶ 10. Nancy testified that she was justified in refusing visitation because of her concerns about the conditions to which the child was apparently exposed to during John's care. Nancy said the child would come home with reports of John making her sleep in the same bed with him, leaving the door open while she was taking a bath, using the bathroom while she was bathing, and pulling off the road and threatening her. In one of the child's counseling sessions she indicated in a sentence completion exercise that she hated to take baths.
¶ 11. John testified that on a couple of occasions while visiting his sister, he and his daughter slept in one bed due to the lack of available beds. However, he stated that he never made her sleep in the same bed with him at his home because she had her own bedroom. John also testified that he did make her leave the bathroom door open while she was taking a bath because the bathroom has no ventilation, and that on occasion he has come into the bathroom only to grab a hairbrush or other paraphernalia. Despite Nancy's complaints of mistreatment, both psychologists found no signs of abuse by John.
¶ 12. Nancy testified that she felt justified in withholding visitation considering the child's strong animosity toward her father. She contributed much of the child's reluctance to go to visit John to the fact that John would not take their daughter to many of the child's activities. The child also indicated in one of her counseling sessions with Dr. Bennett that her father would not take her to cheerleading practices.
¶ 13. John agreed that his daughter showed signs of resentment toward him, but he attributed the behavior to Nancy's turning the child against him. He also admitted to not taking the child to some of her activities. He justified this by stating that he thought his daughter was involved in too many activities. He also said that many times he had already made plans prior to learning of his daughter's scheduled events.
¶ 14. The chancellor, after analyzing numerous exhibits and hearing fifteen witnesses which created more than a thousand pages of transcript, rendered his decision on April 3, 2001. The chancellor held that John was not in contempt of court for failure to pay bills, concluding that John was not provided with the bills until after Nancy filed her complaint. The chancellor denied John's request for a change of physical custody, and denied Nancy's request for modification of the visitation order.
¶ 15. The chancellor found Nancy in contempt of court for her failure to abide by prior orders with respect to John's visitation rights. The court entered a revised visitation schedule which allows John to make up twenty days of missed visitation during the summer. The court ordered Nancy to avoid scheduling any *811 events or causing any events to be scheduled for the minor child during John's visitation periods. He also held that Nancy was not to interfere with the visitation rights of John by telephoning or personally contacting the child during John's weekend visitations. Nancy is allowed personal and telephone contact with the child during the extended visitation only if absolutely necessary. The court ordered Nancy to exchange information concerning the health, education and welfare of the child. Finally, the court awarded John attorney's fees in the amount of $4,500. From the judgment, Nancy has perfected her appeal.

LAW AND ANALYSIS
I. DID THE CHANCELLOR ERR IN FINDING NANCY IN CONTEMPT OF THE COURT'S VISITATION ORDER?
¶ 16. "Contempt matters are committed to the substantial discretion of the trial court which, by institutional circumstance and both temporal and visual proximity, is infinitely more competent to decide the matter than we are." Varner v. Varner, 666 So.2d 493, 496 (Miss.1995). If the "contemnor has willfully and deliberately ignored the order of the court," then the finding of contempt is proper. Goodson v. Goodson, 816 So.2d, 420, 422(¶ 3) (Miss.Ct.App.2002). "This Court will not reverse a contempt citation where the chancellor's findings are supported by substantial credible evidence." Id.
¶ 17. The chancellor found Nancy to be in contempt because she deliberately interfered with the court's visitation schedule. The court stated that Nancy on numerous occasions failed to provide the child for weekend visitation, that she intentionally scheduled events during John's visitation weekends, and that when she did make the child available for visits she often contacted the child personally or by telephone causing stress between John and their daughter. On appeal Nancy argued that she was justified in interfering with the court ordered visitation because she was only following the advice given to her by the child's psychologist.
¶ 18. The Mississippi Supreme Court has consistently held that the inquiry in a contempt proceeding is limited to "whether or not the order was violated, whether or not it was possible to carry out the order of the court, and if it was possible, whether or not such violation was an intentional and willful refusal to abide by the order of the court." Ladner v. Ladner, 206 So.2d 620, 623 (Miss.1968) (overruled on other grounds Bubac v. Boston, 600 So.2d 951 (Miss.1992)). The only defenses to a contempt violation include an inability to comply with the court order, McCracking v. McCracking, 805 So.2d 586, 589(¶ 6) (Miss.Ct.App.2002), or that the court order was unclear, Davis v. Davis, 829 So.2d 712, 714(¶ 9) (Miss.Ct.App.2002). In the case at bar, there is nothing within the record to indicate that the parties were unable to comply with the order or that its provisions were unclear.
¶ 19. The fact that such order is erroneous or irregular or improvidently rendered does not justify a person in failing to abide by its terms. Ladner, 206 So.2d at 623 (citing Griffith, Mississippi Chancery Practice § 668 (2d ed.1950)). Therefore, there is no defense for a contempt citation that the contemnor "does not agree with the previous order and considers the order of the court decree to be wrong, even though his motives in so doing are based upon pure moral sentiment." Ladner, 206 So.2d at 623.
¶ 20. In Ladner, the trial court held the custodial parent in contempt for willfully failing to carry out the visitation order. Id. at 622. The father argued that he was justified in denying visitation to the mother *812 considering he feared she would abuse the children. Id. He presented evidence that the mother had previously threatened to kill the children using various weapons; and that she had beaten the children severely during the marriage. Id. The Mississippi Supreme Court affirmed the trial court's decision stating that a contemnor should take the lawful steps, as by appeal, to have the decree or order vacated or corrected. Id. at 623.
¶ 21. Although Nancy claims she was following the advice of Dr. Bennett, she still willfully and intentionally disobeyed the court's visitation order. We are of the opinion that the chancellor was correct in holding Nancy in contempt.
¶ 22. Nancy argues that the court erred in awarding John attorney's fees. In contempt proceedings, "a chancellor has the authority to make the prevailing party whole by awarding attorney's fees." Creel v. Cornacchione, 831 So.2d 1179, 1183-1184(¶ 18) (Miss.Ct.App.2002). "The award of attorney's fees is largely within the sound discretion of the chancellor." Id. The chancellor ruled in favor of John who was the prevailing party. Therefore, we cannot say that the chancellor abused his discretion in awarding attorney's fees in this matter.
II. DID THE CHANCELLOR ERR IN NOT RESTRICTING JOHN'S VISITATION RIGHTS?
¶ 23. Nancy argues on appeal that the chancellor erred by ordering no restrictions or supervision relative to John's visitations. There was conflicting testimony as to why it would be in the best interest of the child that the father's visitation schedule be restricted or supervised. The chancellor determined these issues of fact in favor of John based on the evidence before the court.
¶ 24. "On visitation issues, as with other issues concerning children, the chancery court enjoys a large amount of discretion in making its determination of what is in the best interest of the child." Clark v. Myrick, 523 So.2d 79, 82 (Miss. 1988). "When the chancellor determines visitation, he must keep the best interest of the child as his paramount concern while always being attentive to the rights of the non-custodial parent, recognizing the need to maintain a healthy, loving relationship between the non-custodial parent and his child." Harrington v. Harrington, 648 So.2d 543, 545 (Miss.1994). "This Court will not reverse a chancellor's findings of fact so long as they are supported by substantial evidence in the record." Id.
¶ 25. When modifying a visitation order, it must be shown that the prior decree for reasonable visitation is not working and that a modification is in the best interest of the child. Suess v. Suess, 718 So.2d 1126, 1130(¶ 15) (Miss.1998). Nancy stated that under Suess the visitation order should be modified considering Dr. Bennett's advice that the visitations are harmful to the child, the child's reports of mistreatment while on visitation, John's refusal to allow their daughter to participate in many of her activities while in his care and the child's strong resentment toward going to visitation.
¶ 26. In McCracking v. McCracking, 776 So.2d 691, 694(¶ 11) (Miss.Ct.App. 2000), the chancellor modified a visitation order by restricting visitation to only weekends. After hearing testimony from the guardian ad litem and the court-appointed psychologist, the chancellor determined that the midweek overnight visitation was detrimental to the emotional well-being of the child. Id. This Court held "that a visitation schedule that adversely affects a child's emotional stability is one *813 that is not working within the meaning of Suess." Id.
¶ 27. Unlike McCracking, the chancellor in the case at bar was not convinced by Dr. Bennett's testimony that the visitation order was detrimental to the emotional stability of the child. Dr. Morris's assessment revealed that the child suffered from parental alienation syndrome due to Nancy's continuous intrusion into the child's relationship with her father. The expert testimony in this case created a question of fact as to what was in the best interest of the child.
It is well-settled law that the weight to be accorded expert opinion evidence is solely within the discretion of the judge sitting without a jury. While he may not arbitrarily fail to consider such testimony, he is not bound to accept it. In the ultimate analysis, the trier of fact is the final arbiter as between experts whose opinions may differ as to precise causes....
Newsom v. Newsom, 557 So.2d 511, 515 (Miss.1990) (citing Pittman v. Gilmore, 556 F.2d 1259 (5th Cir.1977)). He found Nancy's complaints of mistreatment unsubstantiated, by the evidence.
¶ 28. Nancy also argues that the visitation decree should be modified considering John will not allow the child to participate in many of her activities. The Mississippi Supreme Court has emphasized the importance of the non-custodial parent's autonomy during visitation. Cox v. Moulds, 490 So.2d 866, 870 (Miss.1986). The court stated that absent extraordinary circumstances, the "non-custodial parent will during the periods of visitation have broad authority and discretion with respect to the place and manner of the exercise of same, subject only to the time constrictions found reasonable and placed in the decree." Id. The court reasoned that by giving freedom to the non-custodial parent it encourages a close, affectionate parent-child relationship. Id.
¶ 29. Nancy also expressed that the visitation order should be modified considering the child's dislike for going to visitation. The Mississippi Supreme Court has affirmatively stated that it is "not bound by the wishes of a child as to the visitation rights of the parents." Ross v. Segrest, 421 So.2d 1234, 1236 (Miss.1982). "While there is nothing wrong with the children being heard regarding their wishes, our law proceeds on the assumption that they are nevertheless children and, thus, more interested in the desire of the moment than in considering the long range needs for the development of a healthy relationship with both parents where that is possible." Cox, 490 So.2d at 869.
III. DID THE CHANCELLOR ERR IN RESTRICTING NANCY'S CONTACT WITH THE CHILD DURING THE CHILD'S VISITATION WITH JOHN?
IV. DID THE CHANCELLOR ERR IN HOLDING THAT NANCY COULD NOT SCHEDULE ANY EVENTS FOR THE CHILD DURING JOHN'S VISITATION?
¶ 30. We will examine these two issues together. They both refer to restrictions placed upon Nancy during John's visitation period. The chancellor ordered Nancy to stop making contact with the child during John's visitation period, and to stop scheduling events for their daughter during the time she is to be with John. Nancy argues that preventing access to her daughter will have a detrimental effect upon the child. She also contends that she has no control over when events are to be scheduled.
¶ 31. As discussed in the previous issue, the Mississippi Supreme Court has recognized that by giving the non-custodial *814 parent much latitude in how they spend time with the child during visitation will help foster a close, affectionate relationship with the child. Cox, 490 So.2d at 870. In the case at bar, the chancellor found sufficient evidence to indicate that Nancy's interference with John visitation was hindering his ability to nurture a close, affectionate relationship with his daughter.
¶ 32. For many of the same considerations discussed in the previous issue, we find a claim that the chancellor acted with manifest error to lack merit. This ruling gives the father the freedom to determine how he and his daughter should spend their time together thereby enhancing that affectionate parent-child relationship.
V. DID THE CHANCELLOR ERR IN REFUSING TO MODIFY THE SUMMER VISITATION SCHEDULE DUE TO ITS CONFLICTING LANGUAGE?
¶ 33. Prior to the judgement, John and Nancy agreed to a divorce, child custody, child support and division of property rights. The only remaining issue for the court to resolve was John's visitation rights during certain holidays and summer vacation. In his decree, the chancellor granted John summer visitation on the following basis:
John Ellis will have the minor child with him five (5) weeks during the summer being in odd numbered years from June 1st through June 14th, July 1st through July 14th, August 1st through August 7th, and in even numbered years from June 14th through June 31st,[2] July 14th through July 31st, and August 1st through August 7th. All visitations during this summer period shall commence at 8:00 a.m. and at 6:00 p.m.
¶ 34. Nancy argues that on even numbered years John is granted an extra week due to the fact that there are more than twenty-eight days in each month. She asserts that due to the conflicting language of the decree the order should be modified.
¶ 35. "To be enforceable a final decree should be sufficiently definite.... [I]t is imperative that the decree be certain, clear, understandable, and subject to comprehension and enforcement. The lack of any one of these elements may result in confusion and subsequent litigation for purposes of interpretation." N. Shelton Hand, Jr., Mississippi Divorce, Alimony and Child Custody § 10-11, 252-253 (5th ed.1998).
¶ 36. After careful review of the record, this Court determines that John will gain five extra days of visitation during the summer months in even years. This contradicts the chancellor's earlier provision that John would receive five weeks of visitation each year during the summer months. In sum, the chancellor's determination is unclear. This Court therefore remands this particular matter for clarification.
¶ 37. THE JUDGMENT OF THE UNION COUNTY CHANCERY COURT IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART. COSTS OF THIS APPEAL ARE ASSESSED NINETY PERCENT TO THE APPELLANT AND TEN PERCENT TO THE APPELLEE.
KING AND SOUTHWICK, P.JJ., THOMAS AND IRVING, JJ., CONCUR. BRIDGES, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY LEE AND MYERS, JJ. MYERS, J., DISSENTS IN PART WITH SEPARATE WRITTEN OPINION *815 JOINED BY LEE AND GRIFFIS, JJ. McMILLIN, C.J., NOT PARTICIPATING.
MYERS, J., dissenting in part:
¶ 38. I respectfully dissent to Part V of the Court's opinion. The chancellor gives specific dates that John Ellis will have the child with him. I interpret the term "five weeks" as surplusage. Thus, we should read the decree as we would read a contract or a statute, where specific terms are given greater weight than general ones. John should have the child on the dates specified, regardless of whether or not they add up to be exactly thirty-five days.
LEE AND GRIFFIS, JJ., JOIN THIS SEPARATE OPINION.
BRIDGES, J., concurring in part, dissenting in part:
¶ 39. I also am of the opinion that the majority reaches a wrong decision with respect to visitation, Part V, and, as a result, I also dissent and join and expand the enumerated reasons for unjustness by Judge Myers in his dissent. However, I concur with all other parts of the majority opinion.
¶ 40. I disagree with the majority when it determines that John would gain five extra days of visitation during the summer months in his even years of visitation. When Nancy exercises her visitation during the alternating summer, she gains the same five days (during the same period), so that neither has any more summer visitation than the other at the end of a two year period of time. The chancellor surely considered this when he so adjudicated the visitation. At least we must assume this. The chancellor's decree would then be sufficiently definite, clear, understandable and subject to comprehension and enforcement as set forth in Shelton Hand, Mississippi Divorce, Alimony and Child Custody, §§ 10-11, 252-53 (5th ed.1998). Further, I do not find in the record of this case where the chancellor was at all concerned with establishing a visitation schedule based upon a twenty-eight day per month calculation.
¶ 41. A much more serious deficiency in the final order or decree was that of failing to order what year this visitation period would commence. The chancellor's intention for such beginning apparently was the next summer, or summer of 1999, and if the parties have operated and complied in such a manner, then that has been established, and as such, been cured.
¶ 42. This Court and the Mississippi Supreme Court endeavor to affirm the orders and decrees of chancellors whenever possible unless the chancellor's findings of fact are "manifestly wrong," unsupported by substantial credible evidence, or "clearly erroneous." Mississippi State Department of Human Services v. Barnett, 633 So.2d 430, 434 (Miss.1993). In my opinion, none of those circumstances apply here.
¶ 43. Therefore, I would affirm the chancellor as to this and all other matters.
LEE AND MYERS, JJ., JOIN THIS SEPARATE OPINION.
NOTES
[1] "Parental Alienation Syndrome (PAS) is a disorder that arises primarily in the context of child custody disputes. Its primary manifestation is a child's campaign of denigration against one parent without justification. It results from a combination of the programming parent's indoctrinations and the child's own contributions to the vilification of the target parent. PAS refers only to situations in which parental programming is combined with the child's own disparagement of the vilified parent." Barbara Bevando Sobal, William M. Hilton, Article 13(B) of the Hague Convention Treaty: Does It Create A Loophole For Parental Alienation Syndrome?, 19 GPSolo 16, 16 (2002).
[2] June only has thirty days in the calendar year.