# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-01745-COA

**ASHLEY SAVELL**                                                    **APPELLANT**

v.

**JASON MANNING**                                                    **APPELLEE**

DATE OF JUDGMENT:              10/14/2019
TRIAL JUDGE:                   HON. FRANKLIN C. McKENZIE JR.
COURT FROM WHICH APPEALED:     JONES COUNTY CHANCERY COURT,
                               SECOND JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:        JEFFREY BIRL RIMES
ATTORNEY FOR APPELLEE:         JASON MANNING (PRO SE)
NATURE OF THE CASE:            CIVIL - CUSTODY
DISPOSITION:                   AFFIRMED IN PART; REVERSED AND
                               REMANDED IN PART - 08/31/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE WILSON, P.J., GREENLEE AND WESTBROOKS, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.     Jason Manning and Ashley Savell are the parents of one child, Allen,[1] who was born in 2017.  Jason and Ashley have never been married, and Jason was not listed on Allen's birth certificate.  A few months after Allen's birth, Jason filed a complaint to establish paternity and seeking custody of Allen.  Ashley answered, admitted Jason's paternity, and filed a counterclaim for custody and child support.  The chancellor granted Ashley temporary physical and legal custody and Jason supervised visitation.  Jason later filed four contempt petitions against Ashley, alleging that she had repeatedly denied him visitation with Allen.

---

[1] Fictitious names have been used for the minor children mentioned in this opinion.

Ashley also filed two contempt petitions against Jason.

¶2. Following a trial, the chancellor awarded physical custody of Allen to Ashley, joint legal custody to Ashley and Jason, and visitation to Jason. The chancellor also found that Ashley was in criminal and civil contempt of court for denying Jason visitation, awarded Jason attorney's fees, and sentenced Ashley to serve thirty days in jail. However, he suspended Ashley's sentence on the condition that she comply with the court's order regarding visitation. The chancellor found that Jason was not in contempt.

¶3. On appeal, Ashley alleges that the chancellor erred by (1) not appointing a guardian ad litem (GAL), (2) not finding Jason in contempt, (3) finding her in contempt, (4) conditioning the suspension of her sentence on her compliance with the court's orders, (5) not making additional findings to support his award to Jason of $2,400 in attorney's fees, (6) not providing for Allen's medical support in the final judgment, and (7) ordering the parties to "share[]" Allen's school and extracurricular expenses "in proportion to the parties' incomes." We find no error with respect to issues (1) through (5), but we remand the case for clarification regarding Allen's medical, school, and extracurricular expenses. We also direct the chancellor to amend the final judgment to clarify that Ashley has physical custody and that the parties share joint legal custody.

**FACTS AND PROCEDURAL HISTORY**

¶4. Ashley gave birth to Allen in July 2017. Allen's father was not identified on the birth certificate. In September 2017, Jason filed a complaint to establish paternity and for custody of Allen. Ashley answered and filed a counterclaim for custody and child support.

¶5.     Following allegations of drug use, the chancellor ordered both parties to take drug tests. Jason tested positive for marijuana, while Ashley tested negative for all substances. The chancellor also orally granted Jason temporary supervised visitation.

¶6.     In November 2017, Jason filed a petition alleging that Ashley was in contempt for failing to follow a temporary visitation schedule set by the chancellor. The chancellor had granted Jason limited supervised visitation during a hearing in October, but the hearing was not transcribed, and the chancellor did not immediately enter a written order regarding visitation. In her response, Ashley admitted that she had denied Jason visitation but disputed Jason's understanding of the chancellor's order. She also claimed that Jason had refused to submit to supervision. Ashley also filed a motion for temporary legal and physical custody of Allen.

¶7.     In December 2017, the chancellor entered a temporary order granting Jason up to two hours of supervised visitation at least once per week. In January 2018, the chancellor held a hearing on Ashley's motion for temporary custody. Jason did not appear at the hearing. Prior to the hearing, Jason had fired his attorney, and the chancellor had granted the attorney's motion to withdraw. Following the hearing, the chancellor granted Ashley temporary legal and physical custody of Allen while leaving in place Jason's right to supervised visitation. The chancellor also ordered Jason to pay child support. Jason later filed a motion to set aside or modify the temporary order, claiming that he had not been aware of the hearing. In March 2018, the chancellor entered another temporary order granting Jason temporary supervised visitation every weekend from Friday to Sunday. The

order named three possible supervisors for the visits.

¶8. A month later, Jason filed a petition for contempt against Ashley, in which he alleged that she had denied him visitation with Allen. In August 2018, Jason filed another petition for contempt, alleging that Ashley had continued to deny him visitation. Ashley admitted that she had refused Jason's attempts to exercise visitation but again claimed that Jason had refused to submit to supervision. She filed a counter-petition for contempt, alleging that Jason was not following the chancellor's order that all visits with Allen be supervised.

¶9. In September 2018, the chancellor entered a new temporary order. The chancellor stated that he had been "advised that the parties have reached an agreement with regard to the [c]ontempt issues," and he did not rule on their pending petitions for contempt. He also granted Jason unsupervised visitation every other weekend from Friday to Sunday.

¶10. Less than one month later, Jason filed another petition for contempt, again alleging that Ashley had denied him visitation. Ashley admitted that she had refused visitation, and she requested the appointment of a GAL. She alleged that Jason had "failed to provide a safe environment for [Allen] during his visitation" and said that Allen was in "poor physical condition" when he returned from visitation. She also alleged that Allen had been "exposed to an unsafe environment from another family member" during Jason's visitation and that Jason had refused to address that concern with her. Ashley provided no additional details regarding these allegations.

¶11. Ashley later contacted Jones County Child Protective Services (CPS) and made allegations of abuse and neglect against Jason. She also told Jason that she would not allow

4

him to have visitation until CPS closed its investigation. The chancellor issued a subpoena for CPS's records and reviewed them in camera.

¶12. In January 2019, Ashley filed another petition for contempt, alleging that Jason had admitted in a deposition that he had failed to comply with the requirements of supervised visitation under prior court orders. She also alleged that Jason had threatened and harassed her and had not informed her of his new address or Allen's whereabouts during his visitation. Two weeks later, the case went to trial on the issues of custody, visitation, and support and the parties' petitions for contempt.

¶13. Jason testified that he had three children, including a thirteen-year-old son, Abraham, who lived with him. A paternity test established that he was Allen's father, but he said that Ashley had not paid her half of the cost of the paternity test, despite a court order to do so. He testified that he was uncertain of the state of Allen's health because Ashley refused to tell him the name of Allen's doctor. He said that he had received a list of Allen's allergies, but Ashley would not share any medical records with him.

¶14. He testified that Ashley had denied him his scheduled visitation on nine different occasions from May to September 2018. Following a hearing on September 13, Ashley had allowed his scheduled visitation on September 14-16, but she refused to allow him any visitation since that time.

¶15. Jason testified that when Ashley denied him visitation, she would say that Allen was sick or reference the CPS investigation. Ashley also told Jason that her "attorney was aware of the situation" and knew "the reason" that she was denying visitation. In another message,

5

Ashley told Jason he could not exercise visitation because of "[c]ertain situations involving [Abraham] that ha[d] occurred recently in a public setting." Ashley stated that she would not allow visitation "unless [Jason could] assure [her] that [Abraham would] not be anywhere around [Allen] for the entire weekend." However, neither the chancellor nor CPS had ever instructed Jason to prevent contact between Abraham and Allen.

¶16.    Jason testified that he had been Abraham's sole caregiver since Abraham was five. Abraham has been diagnosed with Attention Deficit Disorder and Asperger syndrome. Jason also has a daughter, Carly, but he is not listed on her birth certificate, does not pay child support for her, and does not see her often. Jason testified that he had not been able to establish paternity or seek visitation with Carly because her mother moves frequently.

¶17.    At the time of trial, Jason had been employed at an apartment complex for about three years. He said that he had extensive support from his immediate family, including his mother and two sisters. He had moved into a three bedroom, two bathroom house. He admitted that he was living with his girlfriend and that they had been dating for only a few months. He also admitted that he had not provided his new address to Ashley or the court. He testified that he was in good health and attended church regularly.

¶18.    Ashley testified that she lived with Allen and her older son and that her only income was child support from Jason and her older son's father and occasional assistance from family members. At the time of trial, she had been unemployed for over a year. She testified that she was looking for work but would need childcare for her sons if she found a job.

¶19.    She testified that she denied Jason visitation when Allen was sick because "[w]hen

6

a child is sick, they want their mother." She admitted that she had not complied with the chancellor's visitation orders. She said that the chancellor could not "see what [she saw] going on." However, she never filed a motion to modify visitation. She testified that she "kept in contact with [her] attorney and . . . followed the advice of [her] attorney" and that her attorney never advised her to seek to modify visitation. But she admitted that her attorney never told her to defy the court's orders.

¶20. Ashley testified that she once refused visitation because the car seat that Jason had for Allen was moldy. She also said that Jason refused to tell her where he would be with Allen, which she thought was common courtesy, though not a requirement of the court's order. She admitted that the court's orders did not give her permission to deny visitation. But she said that she believed she had valid reasons for denying visitation, and she asserted that each time she denied visitation, she did so because "it was not in [Allen's] best interest to go." She said, "I believe that if the [chancellor] could see everything I have to see, then [he] would come to a different conclusion." When asked whether she would follow the court's orders in the future, she answered, "I don't know."

¶21. Ashley testified that in September 2018, Allen returned home from visitation in "horrible condition." She said that although Allen was not physically injured, he was "definitely neglected." Nonetheless, she did not take him to a doctor. She testified that at that point, she "made the decision that [she] would not put [Allen] in harm's way" and that she would not follow the court's orders "as it pertained to [Allen's] safety and wellbeing." Ashley testified that following a prior hearing, her attorney told her the judge had said that

7

she should initiate a CPS investigation if she had concerns. She then reported Jason to CPS for alleged abuse or neglect.

¶22. Ashley testified that she and Jason had known each other since they were teenagers and had an on-and-off romantic relationship. She did not identify Jason as Allen's father on the birth certificate because of his behavior at the hospital after Allen's birth. Jason was angry that no one contacted him to let him know that Ashley was giving birth until after Allen had been born. Ashley testified that she would have contacted Jason but gave birth early due to complications.

¶23. Ashley's mother, Lillian Savell, testified that when Allen was born, Jason and Abraham came to the hospital and that Ashley seemed afraid of Jason. Lillian said that Jason "took" Allen from Ashley and questioned Ashley. Lillian described Jason as "yelling . . . without raising [his] voice." Jason was angry that Ashley had not told him about Allen's birth. Lillian explained that Ashley had experienced some complications and did not want anyone there but Lillian. Lillian testified that Ashley had said, "I know [Jason] told me to call him, but I don't want him here." Lillian said that Ashley was afraid of Jason, and Lillian told Jason that he needed to leave because Ashley's blood pressure was increasing. An argument ensued, and Ashley eventually called hospital security. Jason returned to the hospital the next two days but was unable to see Ashley or Allen because security stopped him. According to Lillian, Ashley stayed with her for three weeks after she was discharged from the hospital because she was afraid of Jason.

¶24. Lillian had been present at several visitation exchanges and believed that Jason had

a temper. She said he was especially angry when they wanted to inspect his car seat. Lillian said that the car seat was dirty, full of crumbs, and too small for Allen. Lillian also testified that Jason would refuse to take the food, toys, and clothes that Ashley sent for Allen. Ashley's brother also testified that Jason had been angry at visitation exchanges, but he admitted that Jason had never been violent.

¶25. Lillian claimed that Allen would return from visitation "very thirsty," "hungry," and "exhausted." She said that his stomach would be "messed up" for days after a visit with Jason. She also claimed that Allen returned from different visits with bruises on his thigh and "all up and down [the] side of his face" and a strange "rash all over him."

¶26. Ashley testified that she became worried when she was pregnant because Jason assumed that they would share joint custody and alternate custody week-to-week as soon as Allen left the hospital. Ashley also testified that she "felt very threatened" because Jason would call her and send her text messages every day, but none of those messages were offered at trial. She stated that she was concerned about Abraham being around Allen because when Abraham held Allen in the hospital, Abraham "was looking at the television the whole time" and "wasn't even paying attention to the fact that he was holding a newborn baby." In addition, Ashley testified that she had "seen [Abraham] at church a couple times, and . . . he can be very disruptive" and "very aggressive to other children when playing."

¶27. During trial, the chancellor received CPS's findings regarding Ashley's allegations against Jason. The chancellor noted that the allegations had been deemed "unsubstantiated." CPS identified only relatively minor safety concerns regarding conditions in Jason's home,

9

which Jason acknowledged and remedied. CPS's report was admitted into evidence.

¶28. Following trial, the chancellor granted Ashley physical custody and granted Jason standard unsupervised visitation every other weekend, on holidays and birthdays, and during summer and spring breaks. The chancellor also ordered that Jason be named as the father on Allen's birth certificate, ordered Allen's surname to be changed to Manning, and ordered Jason to pay $286 per month in child support. The chancellor found Ashley to be in criminal and civil contempt. He ordered her to pay $2,400 in attorney's fees to Jason. He also sentenced her to serve thirty days in jail but stayed the sentence "as long as she abides by [the] court's order." The chancellor ordered that if Ashley again denied Jason visitation and was found in contempt after a hearing, she would be immediately incarcerated.

¶29. Ashley filed a motion to alter or amend the judgment, which the chancellor granted in part and denied in part. She then filed a notice of appeal. On appeal, she raises the seven issues noted above. *See supra* ¶3.

## ANALYSIS

### I. The Chancellor did not abuse his discretion by not appointing a GAL.

¶30. "In child-custody cases where [allegations of] abuse and/or neglect are raised, the chancellor's decision to appoint a guardian ad litem may be mandatory or discretionary." *Carter v. Carter*, 204 So. 3d 747, 758-59 (¶50) (Miss. 2016). "The appointment is mandatory where the allegations of abuse and/or neglect rise to the level of a 'charge of abuse and/or neglect' . . . ." *Id.* at 759 (¶50) (quoting Miss. Code Ann. § 93-5-23 (Rev. 2013)). "However, under Mississippi Code Section 93-5-23, the chancellor is provided

10

discretion to determine if issues of abuse or neglect have sufficient factual basis to support the appointment of a guardian ad litem." *Id.* at (¶51). That is, the statute gives "the chancellor some discretion in determining whether there is a legitimate issue of neglect or abuse even in those situations where one party elects to make such an assertion in the pleadings." *Id.* (quoting *Johnson v. Johnson*, 872 So. 2d 92, 94 (¶8) (Miss. Ct. App. 2004)). The chancellor is not required to "appoint[] . . . a guardian ad litem based merely on an unsubstantiated assertion found in the pleadings of one of the parties." *Id.* at (¶52) (quoting *Johnson*, 872 So. 2d at 94 (¶8)); *accord Monk v. Fountain*, 296 So. 3d 761, 765 (¶16) (Miss. Ct. App. 2020); *Brown v. Hewlett*, 281 So. 3d 189, 197 (¶30) (Miss. Ct. App. 2019).

¶31. In this case, Ashley asked the chancellor to appoint a GAL in November 2018 in a "Counterclaim to Appoint a [GAL]" that she appended to her response to Jason's then-most-recent petition for contempt.[2] Therein, Ashley alleged:

> Jason has failed to provide a safe environment for [Allen] during his visitation. This is evidenced by the poor physical condition [Allen] was in at the time of the September 14-16, 2018 visitation. Ashley would further show that [Allen] is also exposed to an unsafe environment from another family member during the visitation.

Ashley provided no additional details regarding these allegations. In addition, although her "Counterclaim" cited caselaw requiring the appointment of a GAL in cases in which there are allegations of abuse or neglect, Ashley never specifically alleged that Allen had been "neglected" or "abused."

---

[2] Ashley should have made her request by motion, rather than as a "Counterclaim" appended to a response to a contempt petition. *See* M.R.C.P. 7(b)(1) ("An application to the court for an order shall be by motion . . . .").

¶32. In her appellate brief, Ashley asserts that "[t]he chancellor advised that he would not appoint a [GAL] to investigate the allegations of abuse or neglect and directed Ashley to report her claims to CPS for CPS to investigate instead." However, the only record citations that Ashley provides are to her own double-hearsay testimony at trial, where she briefly testified about what her attorney told her about what the chancellor allegedly said.[3] Ashley never noticed her "Counterclaim" for a hearing, and there is no transcript of the hearing referenced in Ashley's trial testimony. Therefore, we have no way to determine whether Ashley gave any testimony at that hearing that would have warranted the appointment of a GAL. Nor is there anything to substantiate Ashley's claim that the chancellor ignored legitimate allegations of abuse and told her to "go through CPS."

¶33. This Court recently addressed a similar issue in *Monk*, *supra*. There, the appellant, Monk, argued that the chancellor erred by failing to appoint a GAL after an allegation of abuse. *Monk*, 296 So. 3d at 765 (¶17). Monk filed a pretrial motion to appoint a GAL but never set the motion for a hearing. *Id.* During the trial, the chancellor remarked that he had not heard anything about the alleged abuse or neglect, and Monk then tried to explain the reasons for her motion. *Id.* at (¶¶18-19). We held that the chancellor did not abuse his discretion by not appointing a GAL because the "allegations were made belatedly and only after the chancellor's pointed comments that the first day of trial was nearly complete and that there had been no evidence of parental unfitness." *Id.* at 766 (¶22). We also noted that

---

[3] Tr. 44 ("After we appeared in court in November it was the 8th I believe. My attorney advised me that the judge actually said if we had concerns we should go through CPS."); Tr. 92 ("And then in November my attorney tried to file for a [GAL] to address all of the concerns we had. And we were told we need to go through CPS . . . .").

"Monk's credibility was undercut significantly by the fact that she failed to disclose any specific allegation of abuse in discovery." *Id.*

¶34. The result is the same here. Ashley's written request for a GAL did not include any specifics or even an express allegation of abuse or neglect, and there is nothing in the record to indicate that she presented any specifics to the chancellor prior to trial. At trial, she testified that Allen had come back from a visitation with Jason dirty, tired, and experiencing digestive issues. But by that time, Ashley's credibility had been undermined significantly, and CPS had investigated her allegations and deemed them unsubstantiated. The chancellor is not required to appoint a GAL based on a bare and unsubstantiated allegation in a pleading and has some discretion to determine whether there is a legitimate and sufficient factual basis for the allegation. *Carter*, 204 So. 3d at 759 (¶¶51-52). On the record before us, we cannot say that the chancellor abused that discretion by not appointing a GAL in this case.

## II. The chancellor did not err by declining to find Jason in contempt.

¶35. "[A] citation for contempt is proper where a party has willfully and deliberately ignored the order of the court." *Jones v. Bryant*, 160 So. 3d 724, 727 (¶13) (Miss. Ct. App. 2015) (quotation marks omitted). "In civil contempt actions, the trial court's findings are affirmed unless there is manifest error." *Id.* (citing *Riley v. Wiggins*, 908 So. 2d 893, 897 (¶7) (Miss. Ct. App. 2005)).

¶36. Ashley argues that the chancellor erred by not finding Jason in contempt for violations of the court's orders. She claims that Jason admitted at trial that he did not comply with the court's order regarding supervised visitation and that he should have been held in contempt

13

as a result. Specifically, Ashley argues that the following testimony proves Jason deliberately violated the court's orders:

Q: What is your understanding of what that supervision [for visitation] was supposed to be?

A: Was that I would be at the residence of one of the supervisors' house while I was with the child.

Q: And that you would . . . need to be under their constant direct observation. Correct?

A: Yes.

Q: But that's not what happened is it?

A: No.

¶37. However, Ashley has omitted other testimony necessary for context. Immediately prior to the above-quoted testimony, Jason was asked if he was ever alone with Allen during his visitation. Jason answered, "No." But when asked if he was ever alone in a vehicle with Allen, Jason said, "There were times when I had to leave one supervisor's house to go to another supervisor's house. My son [Abraham] was with us. . . . So yes, I was unsupervised for that five-minute drive. But not through the course of the weekend." Then, immediately after the above-quoted testimony, Jason testified as follows:

Q: And it wasn't just in the vehicle either, was it?

A: Yes, it was.

Q: There were times when you were in parts of various supervisors' homes where you were not within eyesight of the supervisors for periods of time. Is that correct?

THE COURT: That's not what the court intended for supervision. That

14

the visitation occur either with them at his residence or him at their residence. I mean, people have to use the bathroom every now and then.

The chancellor then told Ashley's counsel to "move on to something else."

¶38. The chancellor clearly concluded that Jason did not willfully and deliberately disobey a court order by being out of sight of a supervisor for brief periods over the course of weekend visits. Moreover, when Jason's testimony is considered in full, there is substantial evidence to support the chancellor's decision to not hold Jason in contempt.

¶39. Ashley also argues that Jason should have been held in contempt for violating Uniform Chancery Court Rule 8.06, which requires each party to a custody dispute to keep the other party and the court clerk informed of any change of address. Rule 8.06(e) further provides that a "[w]illful failure to comply with [the] rule may be treated as contempt." At trial, Jason admitted that he moved around September 2018 and had not provided Ashley or the clerk his new address. However, no further evidence was presented to show that Jason's violation of the rule was willful or deliberate rather than an oversight. We cannot say that the chancellor abused his discretion by declining to find Jason in contempt for his failure to comply with the rule.

### III. The chancellor did not err by finding Ashley in contempt.

¶40. Ashley argues that she should not have been held in contempt for denying Jason visitation. She argues that after the chancellor declined to appoint a GAL, she was only "attempting to protect [Allen] in the only way she thought she could." She also argues that the chancellor erred by finding her in contempt "without identifying her offending conduct

15

with specificity."

¶41.    The chancellor found Ashley in both civil and criminal contempt. "[T]he primary purpose" of civil contempt "is to enforce the rights of private party litigants or to enforce compliance with a court order." *Purvis v. Purvis*, 657 So. 2d 794, 796 (Miss. 1994). In contrast, criminal contempt is "designed to punish for past offenses" "directed against the court's dignity and authority." *Id.* at 797. A court can order incarceration for civil contempt, but the contemnor must be released from incarceration once she complies with the court's order. *Id.* at 796-97; *see also Merchants Nat'l Bank, Vicksburg v. Stewart*, 523 So. 2d 961, 962 (Miss. 1988) ("[I]n all civil contempt matters, of course, the party in contempt metaphorically has the keys to the jailhouse door in his pocket."). However, because "[c]riminal contempt penalties are designed to punish for past offenses," "they do not end when the contemnor has complied with the court order." *Purvis*, 657 So. 2d at 797.

¶42.    "The Mississippi Supreme Court has consistently held that the inquiry in a contempt proceeding is limited to whether or not the order was violated, whether or not it was possible to carry out the order of the court, and if it was possible, whether or not such violation was an intentional and willful refusal to abide by the order of the court." *Ellis v. Ellis*, 840 So. 2d 806, 811 (¶18) (Miss. Ct. App. 2003) (quotation marks omitted). "The only defenses to a contempt violation include an inability to comply with the court order or that the court order was unclear." *Id.* (citations omitted). It is not a "defense . . . that the contemnor does not agree with the previous order and considers the order of the court decree to be wrong, even [if her] motives . . . are based upon pure moral sentiment." *Id.* at (¶19) (quotation marks

16

omitted). "A party must file a motion and obtain a modification of the judgment establishing visitation rather than simply ignore its provisions." *Brown*, 281 So. 3d at 199 (¶37).

¶43.    "Whether a party is in contempt is a question of fact to be decided on a case-by-case basis." *Gilliland v. Gilliland*, 984 So. 2d 364, 370 (¶19) (Miss. Ct. App. 2008). "A chancellor has substantial discretion in deciding contempt matters because of the chancellor's temporal and visual proximity to the litigants." *Id.* at 369-70 (¶19) (quotation marks omitted). With respect to a finding of civil contempt, "the factual findings of the chancellor are affirmed unless manifest error is present and apparent." *Purvis*, 657 So. 2d at 797. However, when reviewing a finding of criminal contempt, this Court "proceeds ab initio to determine whether the record proves the appellant guilty of contempt beyond a reasonable doubt." *Id.* (emphasis omitted).

¶44.    In this case, the chancellor found Ashley in civil and criminal contempt, ordered her to pay $2,400 in attorney's fees to Jason, and ordered her to be jailed for thirty days; however, the chancellor suspended Ashley's sentence "as long as she abides by [the] court's order." The chancellor further stated that if Ashley continued to deny Jason visitation, and if she was again "found in contempt after a hearing," she would be immediately incarcerated for thirty days. In his bench ruling, the chancellor explained the basis of his finding of contempt as follows:

> The Court . . . finds beyond a reasonable doubt that Ashley has violate[d] the court's orders on at least 14 separate occasions. The Court finds her in civil contempt for those violations and the Court finds her in criminal contempt for those violations.
>
> As for the civil aspect, the Court orders her to reimburse Jason the cost of

17

> filing the contempt actions that he's filed, which consist of three. And that total amount would be $2,400.
>
> As to the criminal aspect of it, the Court's going to order her to serve 30 days in jail but suspend the imposition of that sentence on condition that she follow this Court's order in the future unless excused by this Court.

¶45. Ashley admitted at trial that she repeatedly had denied Jason his court-ordered visitation because, in her opinion, she had a "reasonable reason" to do so. Jason testified and provided the court with a calendar indicating that Ashley had withheld visitation from him on eighteen different weekends, but Ashley testified that she had allowed visitation on at least three of those weekends. Taking the testimony of both Jason and Ashley into account, the chancellor's finding that Ashley violated court orders on fourteen separate occasions is supported by the record. Furthermore, Ashley's disobedience was willful and based solely on her disagreement with the court's orders. On the evidence presented, her criminal contempt—disregarding direct orders of the court—was proved beyond a reasonable doubt. Likewise, the chancellor's finding of civil contempt is supported by substantial evidence. Accordingly, both findings must be affirmed.

### IV. Ashley's suspended sentence is lawful.

¶46. Ashley argues that her thirty-day suspended sentence for criminal contempt is unreasonable because it "effectively places [her] on probation for the next twenty years," i.e., until Allen reaches the age of majority. Citing Mississippi Annotated Code section 47-7-37(1) (Supp. 2020), Ashley notes that the statutory maximum for probation is five years. She then argues that "[a] probationary term of twenty years is unreasonable and unlawful."

¶47. Ashley's argument is without merit. Ashley was not placed on supervised or reporting

18

probation, which is subject to section 47-7-37(1)'s five-year limitation. Rather, the chancellor simply *suspended* her thirty-day sentence. As our Supreme Court has explained, "'suspending the imposition or execution of a sentence' and 'placing a defendant on probation' . . . are distinguishable and serve discrete functions carried out by different branches of our state government. Importantly, these two sentencing tools can be used by a trial judge either separately or together." *Johnson v. State*, 925 So. 2d 86, 91 (¶9) (Miss. 2006). They are similar in that both involve a conditional release of the defendant, but they "are *not* interchangeable mechanisms." *Id.* at 93 (¶12) (emphasis added).

¶48. A suspended sentence is one that the defendant is not actually required to serve at the time that it is imposed. *Id*. at 92-93 (¶¶10, 12). The sentence is suspended subject to the defendant's compliance with conditions set by the trial court. *Id.* at 93 (¶12). "Under a suspended sentence the defendant is not required to report to an officer as he is while on probation. However, the trial court does possess the power to revoke the suspended sentence" if the defendant violates the conditions of the suspension. *Id.* at 93 (¶12) (citations omitted) (quoting *Carter v. State*, 754 So. 2d 1207, 1210 (¶12) (Miss. 2000) (Mills, J., dissenting)). In contrast, a defendant conditionally released on probation is placed "under the supervision of a probation officer" and "must make periodic reports" to that officer. *Id.* (quoting *Carter*, 754 So. 2d at 1210 (¶12) (Mills, J., dissenting)).[4]

---

[4] Opinions sometimes refer to "unsupervised probation," *Johnson*, 925 So. 2d at 92 n.5, and it is sometimes said that a defendant is "on probation" even if he is only serving a suspended sentence. As our Supreme Court has explained, "'[u]nsupervised probation' is the functional equivalent to 'a straight suspended sentence' to the extent that the sentence is not under the supervision of the Department of Corrections, but under the watchful eye of the sentencing judge. Therefore, when we endorse 'unsupervised probation' . . . , we are

¶49. Here, the chancellor clearly did not sentence Ashley to a term of "probation" in any legal sense. Ashley is not required to report to a probation officer. Nor is she subject to the array of conditions that typically accompany a probationary sentence. *See* Miss. Code Ann. § 47-7-35 (Rev. 2015). Rather, the chancellor simply suspended her thirty-day jail sentence on one narrow condition—that she comply with the court's order regarding Jason's visitation rights. That is a straight suspended sentence only, and it is not subject to the five-year limitation on reporting or supervised probation under section 47-7-37(1).

¶50. While Ashley's argument regarding "probation" is without merit, we do note that a different statute, Miss. Code Ann. § 99-19-25 (Rev. 2020), is potentially relevant. That statute provides that "in misdemeanor cases" "circuit courts and . . . county courts" may not revoke a suspended sentence "after a period of five . . . years," and "justice courts" may not revoke a suspended sentence "after a period of two . . . years." *Id.* However, it is not clear that this statute applies here because, by its literal terms, it does not apply to chancery courts. Moreover, there is no authority addressing the question whether a finding of criminal contempt of court is a "misdemeanor" for purposes of this statute. Because Ashley has not cited this statute or addressed these issues, we decline to do so.[5]

---

merely sanctioning a straight suspended sentence . . . ." *Id.* Accordingly, a straight suspended sentence is not subject to the five-year limitation found in section 47-7-37(1) even if it is colloquially referred to as "unsupervised probation." *See Miller v. State*, 875 So. 2d 194, 200 (¶11) (Miss. 2004).

[5] *See Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) ("The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.").

¶51. For purposes of this appeal, it is sufficient to hold, first, that the chancellor clearly did not impose an illegal term of "probation" and, second, that there is nothing unlawful about the sentence that the chancellor actually imposed—a thirty-day jail sentence for criminal contempt suspended on the condition that Ashley comply with the court's order regarding visitation. Those are the only issues before this Court at this time. If an attempt is ever made to revoke Ashley's suspended sentence after more than five years have passed, she may assert that section 99-19-25 applies or that the revocation is otherwise unlawful. However, as imposed, Ashley's punishment for criminal contempt is valid and is affirmed.

## V.     The chancellor's award of attorney's fees was not erroneous.

¶52. Ashley next argues that the chancellor's award of attorney's fees as a result of her contempt is improper because the chancellor did not make an on-the-record finding that the amount requested was reasonable under the *McKee*[6] factors. This Court has stated that

> [t]he matter of awarding attorney's fees is largely entrusted to the sound discretion of the chancellor. We review the reasonableness of the award only for an abuse of discretion, and we will not reverse unless the award is manifestly erroneous or amounts to a clear or unmistakable abuse of discretion. When a party is held in contempt for violating a valid judgment of the court, attorney's fees should be awarded to the party that has been forced to seek the court's enforcement of its own judgment. The award is intended to reimburse the prevailing party for expenses incurred as a result of the other party's contumacious conduct.

*Brown*, 281 So. 3d at 199-200 (¶40) (quotation marks, citations omitted).

¶53. At trial, Jason presented three employment contracts from his trial attorney, each indicating a fee of $800 to prepare and file contempt actions against Ashley. Ashley did not

---

[6] *McKee v. McKee*, 418 So. 2d 764, 767 (Miss. 1982).

object to the admission of those contracts, nor did she question Jason about them.

¶54. Though the *McKee* factors should be used to determine an appropriate award of attorney's fees, the absence of a *McKee* analysis is not always reversible error. A chancellor may award attorney's fees "based on the information already before it and the court's own opinion based on experience and observation." Miss. Code Ann. § 9-1-41 (Rev. 2014); *see Brown*, 281 So. 3d at 200 (¶42). "When the record as a whole shows that the amount awarded was not unreasonable, we will affirm." *Brown*, 281 So. 3d at 200 (¶42) (quotation marks omitted). Ashley's repeated denials of visitation forced Jason to file successive contempt petitions, and we cannot say that an award of $2,400 for litigating three contempt petitions is unreasonable. *See id.* at 200 (¶43) (affirming an award of attorney's fees in the amount of $5,000). Therefore, we affirm the award of attorney's fees.

> **VI.** **The final judgment should be amended to provide for Allen's medical support and health insurance coverage.**

¶55. Mississippi Code Annotated section 43-19-101(6) (Rev. 2015) provides in relevant part:

> All orders involving support of minor children, as a matter of law, shall include reasonable medical support. . . . In any case in which the support of any child is involved, the court shall make the following findings either on the record or in the judgment:
>
> > (a) The availability to all parties of health insurance coverage for the child(ren);
> >
> > (b) The cost of health insurance coverage to all parties.
>
> The court shall then make appropriate provisions in the judgment for the provision of health insurance coverage for the child(ren) in the manner that is in the best interests of the child(ren). If the court requires the custodial parent

22

to obtain the coverage then its cost shall be taken into account in establishing the child support award. If the court determines that health insurance coverage is not available to any party or that it is not available to either party at a cost that is reasonable as compared to the income of the parties, then the court shall make specific findings as to such either on the record or in the judgment. In that event, the court shall make appropriate provisions in the judgment for the payment of medical expenses of the child(ren) in the absence of health insurance coverage.

¶56. The final judgment ordered Jason to pay $286 per month in child support, but it made no provision for Allen's medical costs or health insurance. In her motion to alter or amend the judgment, Ashley asked the court to address this omission, and during the hearing on the motion, Jason's attorney stated that Allen was "on Medicaid and CHIP[]" (Children's Health Insurance Program). However, the chancellor did not amend the final judgment to address Allen's medical costs or health insurance.

¶57. The requirements of section 43-19-101(6) are mandatory and apply in all cases involving child support. *See Franklin v. Franklin ex rel. Phillips*, 858 So. 2d 110, 115 (¶15) (Miss. 2003) ("A basic tenet of statutory construction is that 'shall' is mandatory . . . ."). Therefore, the chancellor erred by not providing for Allen's medical costs or health insurance in the final judgment, and we must reverse on this issue and remand for the chancellor to amend the final judgment to comply with section 43-19-101(6). If Allen is eligible for and covered by Medicaid and CHIP, the chancellor may amend the judgment to order the parties to keep Allen enrolled in those programs so long as he remains eligible for them. The chancellor should, in addition, make provision for the payment of any uncovered medical expenses incurred for Allen.

    **VII.   The final judgment should be amended to clarify the parties'**

23

**responsibilities with respect to Allen's educational and extracurricular expenses.**

¶58. In her motion to alter or amend the judgment, Ashley also asked the chancellor to amend the judgment to address, inter alia, educational and extracurricular expenses. At the hearing on the motion, the chancellor ruled, "Those [expenses] are shared in proportion to the parties' incomes. And insofar as calculating the custodial parent's income, child support is included in that." The chancellor's subsequent written order on the motion did not address the issue at all. On appeal, Ashley argues that the chancellor's oral order is ambiguous and requires clarification. We agree.

¶59. This Court recently stated that a court order "whether oral or written, should not be so vague as to prevent a reasonable person from understanding its clear legal effect or the potential for contempt in failing to abide by its terms." *Lindsay v. Lindsay*, 303 So. 3d 770, 780 (¶27) (Miss. Ct. App. 2020). In addition, insofar as it is possible, the parties' respective obligations "should be clearly defined within the four corners of the order." *Id.*[7] Here, the record does not clearly establish Ashley's income at the time of trial. In addition, it is not clear whether the chancellor intended for the parties' respective shares of these expenses to be fixed based on their incomes at the time of trial or to fluctuate based on subsequent changes in their incomes. On remand, to clarify the parties' respective obligations, the

___

[7] *See also Morgan v. U.S. Fid. & Guar. Co.*, 191 So. 2d 851, 854 (Miss. 1966) ("A decree 'should be complete within itself[]—containing no extraneous references, and leaving open no matter or description or designation out of which contention may arise as to the meaning. Nor should a final decree leave open any judicial question to be determined by others, whether those others be the parties or be the officers charged with the execution of the decree . . . .'" (quoting Virgil A. Griffith, *Mississippi Chancery Practice* § 625, at 676-77 (2d ed. 1950)).

chancellor should order each party to pay a definite percentage of these expenses, and the parties' obligations should be included in the court's written judgment.

### VIII. The final judgment should be amended to clarify custody.

¶60. The chancellor ruled from the bench that Ashley would have physical custody of Allen (subject to Jason's visitation) and that the parties would share joint legal custody. However, the final judgment does not reflect the chancellor's bench ruling. Although the final judgment sets out Jason's visitation schedule, it does not expressly grant Ashley physical custody, and it makes no mention of joint legal custody. On remand, the chancellor should amend the final judgment to reflect his bench ruling on custody.

### CONCLUSION

¶61. In summary, the chancellor did not err by not appointing a guardian ad litem, by not finding Jason in contempt, by finding Ashley in civil and criminal contempt, in imposing Ashley's suspended sentence for criminal contempt, or in awarding Jason attorney's fees for Ashley's civil contempt. We reverse and remand the case only so that the chancellor may amend the final judgment to make provision for Allen's medical costs and health insurance, to clarify the parties' respective obligations to pay for Allen's school and extracurricular expenses, and to reflect the chancellor's bench ruling on custody.

¶62. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. McCARTY, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**