# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00467-COA

**MEAGAN HOPKINS**                                                          **APPELLANT**

**v.**

**RANDALL PERRY JR.**                                                          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/21/2024 |
| TRIAL JUDGE: | HON. TAMETRICE EDRICKA HODGES |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | JOHN DAVID SANFORD |
| ATTORNEY FOR APPELLEE: | WHITNEY McKAY ADAMS |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 09/16/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., McDONALD AND LASSITTER ST. PÉ, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1. Meagan Hopkins and Randall Perry Jr. had a sexual relationship. Their son G.D.P.[1] was born in July 2013. Randall was adjudicated G.D.P.'s natural father, and through a series of agreed orders culminating in an agreed order entered in June 2021, the Hinds County Chancery Court awarded Meagan sole legal and physical custody of G.D.P. and granted Randall visitation as delineated in that agreed order.

¶2. Randall subsequently filed a petition for contempt against Meagan on several grounds. Randall also requested that custody be modified to grant the parties joint legal custody.

---

[1] We use initials to protect the identity of the minor child.

Additionally, Randall sought to modify his visitation with G.D.P., including a request that G.D.P. spend the full summer with Randall, rather than just two weeks in June and two weeks in July as set forth in the June 2021 agreed order.

¶3. Meagan opposed Randall's petition and filed a counter-claim for contempt against Randall on several grounds. Meagan also requested that the chancery court either suspend Randall's visitation until he could establish a "suitable lifestyle for the child," or order that Randall could have only supervised or restricted visitation with G.D.P.

¶4. After a hearing, the chancellor modified the June 2021 agreed order, awarding Randall and Meagan joint legal custody of G.D.P. and modifying Randall's visitation by increasing Randall's monthly visitation and granting Randall summer visitation with G.D.P. from June 1 through August 1.

¶5. Meagan moved for a new trial. On March 21, 2024, the chancery court denied her motion in part and granted it in part to modify the visitation schedule to allow Meagan one week of summer visitation with G.D.P. to commence on his July birthday.

¶6. Meagan appeals, asserting that (1) the chancellor erred by applying an incorrect legal standard in modifying legal custody of G.D.P.; and (2) the chancellor erred by applying an incorrect legal standard in modifying visitation because, according to Meagan, the chancellor failed to find whether the visitation order in place was not working and failed to consider G.D.P.'s best interest.

¶7. For the reasons set forth below, we reverse the chancellor's July 14, 2023 custody-modification order and remand for proceedings consistent with this opinion on that issue.

2

We affirm the chancellor's visitation modification as set forth in the July 14, 2023 order, as modified by the chancellor's March 21, 2024 order.

## PROCEDURAL HISTORY AND STATEMENT OF FACTS

¶8. Randall was adjudicated the natural, biological father of G.D.P. in an "Agreed Judgment Establishing Paternity, Custody and Support" entered in the Hinds County Chancery Court on April 30, 2014. In that same agreed order, the chancellor awarded Meagan and Randall joint legal custody of G.D.P., with Meagan having sole physical custody of G.D.P., and the chancellor awarded Randall "liberal" visitation, as set forth in that order. The chancellor modified Randall's visitation in a subsequent agreed order entered on March 22, 2018.

¶9. On June 23, 2021, the chancellor entered an "Agreed Judgment of Modification of Custody, Visitation and Financial Relief" (June 2021 agreed order), awarding Meagan sole legal and physical custody of G.D.P. and modifying Randall's visitation to include, among other provisions, one long weekend per month with G.D.P. and summer visitation consisting of two weeks in June and two weeks in July.

¶10. In March 2023, Randall filed a petition for contempt and for modification of the custody and visitation provisions in the June 2021 agreed order. Randall alleged that Meagan failed to abide by various terms in that order, including failing to allow him to exercise his in-person and telephonic visitation with G.D.P. and failing to meet him at the designated location for him to pick up G.D.P. for visitation; intruding on his visitation with G.D.P. by calling the child more often than set forth in the June 2021 agreed order; and failing to keep

3

him apprised of the child's school events and other activities.

¶11. Randall also alleged that modification of the custody and visitation terms was necessary due to several incidents when Meagan interfered with his quality time with G.D.P. and with his ability to care for and love the child. Randall requested that the current custody arrangement allowing Meagan sole physical and legal custody of G.D.P. be modified to grant the parties joint legal custody of their son. Regarding visitation, Randall requested a modification in his summer visitation with G.D.P. to allow G.D.P. to spend the full summer (June and July) with Randall.

¶12. Meagan filed her answer and defenses to Randall's petition, together with a counter-complaint for contempt and for modification of Randall's visitation with G.D.P. With respect to her contempt claims, Meagan alleged Randall failed to regularly exercise any telephonic or physical visitation with G.D.P.; failed to facilitate Meagan's telephone calls with G.D.P. when the child was in Randall's care; and failed to pay certain expenses. Meagan also sought to modify visitation, alleging that it was in the child's best interest that Randall's visitation be suspended "until such time as he can establish a stable and suitable lifestyle for the child" or, alternatively, that "Randall's visitation . . . be supervised or restricted to prohibit any overnight visits."

¶13. On May 15, 2023, the chancery court held a one-day hearing on the parties' petitions. G.D.P. was nearly ten years old at the time of the hearing.

¶14. Randall presented his case first. Randall testified, as did his parents, Randall Perry Sr. and Angela Perry; Randall's fifteen-year-old son, A.T.S., from another relationship; and

4

two of Randall's long-time friends, Matthew McMullan and John Riseden.

¶15.    Randall testified that the last time G.D.P. came to his home for visitation was October 2022.  Randall, the Perrys, McMullan, and Riseden all testified that before then, Randall and G.D.P. would go horseback riding, hunting, camping, boating, and fishing together during G.D.P.'s visitation.  G.D.P. had his own horse and would take care of it himself when he had visitation.  The Perrys, McMullan, and Riseden testified that Randall was a loving and caring father, and he appropriately disciplined G.D.P. when necessary.

¶16.    Randall's time with G.D.P. stopped after Randall took G.D.P. camping at Roosevelt State Park during his visitation. They put up tents and had a "good old time."  He testified that Meagan called G.D.P. while they were camping, and G.D.P. became upset; so Randall knew that Meagan must have been upset, too. Randall brought G.D.P. to Meagan after G.D.P.'s visitation, and later that same day, Meagan told Randall "[t]hat [G.D.P.] would not be coming back to see [Randall] or [his] parents."  Randall was then blocked from communicating with G.D.P.  Both Randall and his father testified that after that time, Meagan did not show up with G.D.P. for visitation at the scheduled meeting place.

¶17.    After Meagan told Randall that G.D.P. would not be having visitation with him, Randall testified that he tried to find opportunities to see G.D.P., like G.D.P.'s football games and school activities, but Meagan would interfere.  In December 2022, Meagan told Randall that "he was not welcome at [G.D.P.'s] school anymore."  She did not tell him why.  Randall testified that he had never had any bad interactions at the school or with any students or parents.

¶18. The Perrys and Riseden testified about other ways Meagan interfered with visitation. Mr. Perry testified that after Meagan began withholding G.D.P. from visitation, she told them (Randall and his parents) that they were not going to see G.D.P. until they all had "a conversation . . . to discuss what we [(Randall and his parents)] could and couldn't do as far as being around [G.D.P.]." Mrs. Perry testified that even when Randall did have visitation with G.D.P., Meagan would call "morning, noon, night, all in between" during that time. Meagan's calling would interfere with visitation, and G.D.P. would become upset. Randall's friend, Riseden testified that G.D.P. was his "little buddy," and Riseden and Randall went to G.D.P.'s football games and some school events together. After these events, if he (Riseden) and Randall tried to talk with G.D.P., Meagan would take G.D.P. away.

¶19. Randall also testified about an incident when Meagan interfered when he tried to see G.D.P. at the hospital after G.D.P. had been admitted for what a doctor thought was appendicitis. G.D.P. was sitting up in bed when Randall arrived and was excited when Randall walked in. As they were "chitchatting," Meagan came in. When Meagan tried to interrupt Randall and G.D.P., Randall ignored her. Meagan went to the nurses' station and had one of the nurses call hospital security and have them go to G.D.P.'s room. Randall testified that to make it less difficult for G.D.P., "I just made it quick and simple and told him I love him and that I'd see him later and I left."

¶20. In addressing Meagan's allegations regarding Randall's purported "lack of stability," Randall testified that he lived in the living quarters portion of his horse trailer. He kept it on his parents' property, adjacent to their home. The living quarters had central heat and air and

6

included a fully equipped kitchen, a separate bathroom, a bed, and a sleeping area for G.D.P. Photos admitted into evidence show that these living quarters were clean and well-maintained.

¶21. Randall was employed by a trucking company. Both Randall and his father testified that if Randall was called in to work in the evenings, G.D.P. would stay with his grandparents (the Perrys), where G.D.P. had his own bedroom.

¶22. Randall testified he had not done anything with G.D.P. that was unsafe or dangerous. Randall's testimony on this point is corroborated by testimony from the Perrys, Riseden, and McMullan. Although Randall acknowledged that he has smoked marijuana, he has never been under the influence of alcohol or drugs when he has been with G.D.P. or any other children. A.T.S. testified that he never knew his father to be under the influence of drugs or alcohol when he was with him, and the Perrys, Riseden, and McMullan likewise testified that they had not seen Randall under the influence of drugs or alcohol around any children. Randall testified that he had received one speeding ticket, maybe two, in the last five years, but no children were in the car. This testimony is likewise corroborated by testimony from A.T.S., the Perrys, Riseden, and McMullan. Randall testified that he has never been arrested except for one time for public drunkenness "in [his] hotel room." The incident happened a long time ago, no children were present, and Randall never even knew why he was arrested and jailed for six hours. The charge was "thrown out."

¶23. Regarding his requests for relief, Randall testified that he was requesting joint legal custody so that he could have equal rights to medical information and other information

7

about G.D.P. Also, because Meagan was keeping him from seeing G.D.P. or even talking to him, Randall testified that he wanted to have the visitation schedule changed to "standard visitation" because one long weekend a month was "not near enough time" to be with his son.

¶24. Randall then rested his case-in-chief.

¶25. Meagan testified at the hearing on her own behalf.[2] Meagan testified about her difficulties co-parenting with Randall. On one occasion during summer visitation in the past, Randall did not return G.D.P. from visitation on time, making G.D.P. late for a scheduled doctor's appointment. Another time, Randall took G.D.P. to the beach during his summer visitation and did not tell Meagan, and then Randall "cut [G.D.P.'s] phone off."

¶26. According to Meagan, she would not hear from Randall "for months" when she had G.D.P., and then he would reappear and want "to be the big boss in charge of everything." She testified about communication issues with Randall but then acknowledged that she could call Randall's parents and reach them if she had questions. Meagan testified that one time

---

[2] Meagan also sought to offer testimony from three witnesses for various purposes, which the chancellor excluded after considering each witness's proffered testimony. In her appellant's brief, Meagan describes the witnesses' proffered testimony and the chancellor's rulings, but she does not raise the exclusion of these witnesses as an issue on appeal, as required by Mississippi Rule of Appellate Procedure 28(3) if she wanted to present that issue for appeal purposes. Nor does Meagan offer argument "with citations to the authorities . . . relied on" in contending that the exclusion of their testimonies was improper. *See* M.R.A.P. 28(7). Any such issues, therefore, are waived. *Russell Real Prop. Servs. LLC v. State*, 200 So. 3d 426, 430 (¶10) (Miss. 2016) ("The Court considers assertions of error not supported by citation or authority to be abandoned."); *Tupelo Redevelopment Agency v. Gray Corp.*, 972 So. 2d 495, 514 (¶52) (Miss. 2007) (noting that the "[f]ailure to cite any authority in support of claims of error precludes this Court from considering the specific claim on appeal"); *accord Boyanton v. Bros. Produce Inc.*, 312 So. 3d 363, 376 n.4 (Miss. Ct. App. 2020).

she saw empty alcohol containers in the back of Randall's vehicle when he picked up G.D.P. Another time, Randall picked up G.D.P. with his truck and did not put G.D.P. in a car seat.

¶27.    In response to the chancellor's questioning, Meagan admitted that she made multiple calls to Randall and his parents during G.D.P.'s visitation with Randall.  Meagan claimed she did that because "[she] could not find her child."  As we address in further detail below, after the chancellor closely questioned Meagan about this reason, Meagan admitted that she knew G.D.P. was with Randall or his parents, and she admitted that neither Randall nor his parents had ever put G.D.P. in an unsafe situation.

¶28.    After additional questioning by the chancellor, Meagan also admitted that after she had begun withholding G.D.P. from visitation, she told Randall and his parents that they were not going to see G.D.P. "until they had a conversation [with her]" "so we could figure out that [Randall] can't keep taking G.D.P. overnight and not let anybody know where [G.D.P.] is at [during G.D.P.'s visitation]."  Meagan admitted that the current visitation order did not require any such "conversation" before G.D.P. could have visitation with his father.

¶29.    At the end of the hearing, the chancellor issued a bench ruling and subsequently entered her "Order of Contempt [and] Order Modifying Custody, Visitation, and Support" on July 14, 2023  (July 2023 order).  Regarding the parties' contempt allegations, the chancellor found Meagan in contempt "for withholding [G.D.P.] from visitation with his father," for "failing to meet and present [G.D.P.] to his Grandparents for visitation," and "for violating this [c]ourt's telephone visitation provisions."  The chancellor found Randall in contempt "for violating this [c]ourt's telephone visitation provisions" and "for failing to

9

reimburse Meagan $70.86 [in medical expenses]." With respect to this finding, the chancellor ruled that "Randall shall purge himself of said contempt by paying said sum directly to Meagan on or before May 19, 2023." The chancellor "denie[d] all other issues of contempt raised by the parties." Neither party appealed the chancellor's contempt rulings.

¶30. Regarding custody, the chancellor modified the parties' custody arrangement by awarding Randall and Meagan joint legal custody of G.D.P. The chancellor addressed her reasoning for modifying custody in her bench ruling issued at the end of the May 15, 2023 hearing. We address these details below.

¶31. The chancellor also modified Randall's visitation with G.D.P., finding "that a material change in circumstances has occurred which adversely affects the minor child necessitating a . . . modification of visitation." In the course of her May 15, 2023 bench ruling and her January 30, 2024 bench ruling on Meagan's post-trial motion, the chancellor addressed Meagan's interference with Randall's visitation with G.D.P. and specifically found that visitation modification "[was] in [G.D.P.'s] best interest." The July 2023 order delineated the modified visitation, awarding Randall summer visitation with G.D.P. each year from June 1 through August 1, rather than the two weeks' visitation in June and again in July as set forth in the June 2021 agreed order. Additionally, the chancellor modified Randall's monthly visitation with G.D.P. from one long weekend a month to visitation from Friday to Monday on the first, third, and fifth weekends of each month. The chancellor had explained her reasoning for modifying Randall's visitation in her May 15, 2023 bench ruling, as we address below.

¶32. Meagan filed a motion for a new trial pursuant to Mississippi Rule of Civil Procedure 59,[3] asserting that the chancellor erred in modifying G.D.P.'s legal custody because the chancellor failed to properly conduct an *Albright* analysis.[4] Meagan asserted that had the chancellor done so, the *Albright* analysis would have shown that a change in custody was not in G.D.P.'s best interest. Meagan also asserted that the new visitation schedule was against G.D.P.'s best interest.

¶33. The chancellor conducted a hearing on Meagan's motion on January 30, 2024. At the hearing, Meagan's counsel addressed the summer visitation issue, asserting that "for a nine-year-old boy that has a good deep and a close bond with his mother, our position is it's not in his best interest to be away from her for all summer, especially when the parties experience communication issues." Meagan requested that she be given "at least equal time in the summer."

¶34. The chancellor denied Meagan's motion for a new trial but modified the summer visitation schedule to allow Meagan one week of visitation in July, beginning on G.D.P.'s July birthday, as set forth in the court's March 21, 2024 written order. In her bench ruling, the chancellor reiterated her reasoning for modifying Randall's visitation following the first hearing, and the chancellor explained why she modified that ruling to allow Meagan a week's visitation in July. We address the chancellor's January 30, 2024 bench ruling and the

---

[3] Meagan filed her motion for a new trial on May 26, 2023, and she filed an amended motion on June 12, 2023. Both motions were filed after the hearing but before entry of the chancellor's July 2023 order.

[4] *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

11

resulting order below.

¶35. Meagan appeals.

## STANDARD OF REVIEW

¶36. In child custody cases, the standard of review "is quite limited. A chancellor must be manifestly wrong, clearly erroneous, or apply an erroneous legal standard in order for this Court to reverse." *A.M.L. v. J.W.L.*, 98 So. 3d 1001, 1012 (¶23) (Miss. 2012). We apply the same standard in reviewing visitation modification cases. *H.L.S. v. R.S.R.*, 949 So. 2d 794, 798 (¶8) (Miss. Ct. App. 2006). "The chancery court's interpretation and application of the law is reviewed de novo." *Culver v. Culver*, 371 So. 3d 726, 729 (¶6) (Miss. Ct. App. 2023) (quotation mark omitted).

## DISCUSSION

### I. Child Custody Modification

¶37. Meagan asserts that the chancellor erred in modifying G.D.P.'s legal custody because the chancellor "did not sufficiently elaborate as to what material change in circumstances had occurred" to warrant a custody modification, nor did the chancellor address how any "alluded-to material change . . . adversely affected [G.D.P.]" Additionally, Meagan asserts that the chancellor's custody modification ruling should be reversed because she failed to conduct an *Albright* analysis in determining whether a legal custody modification was in G.D.P.'s best interest. For the reasons we discuss below, we reverse the chancellor's July 2023 custody modification order and we remand this issue for further proceedings consistent with this opinion.

12

¶38. "To modify child custody, 'the non[]custodial party must prove: (1) that a substantial change in circumstances has transpired since issuance of the custody decree; (2) that this change adversely affects the child's welfare; and (3) that the child's best interest mandates a change of custody.'" *Strait v. Lorenz*, 155 So. 3d 197, 203 (¶20) (Miss. Ct. App. 2015) (quoting *A.M.L.*, 98 So. 3d at 1013 (¶24)). "In making a custody-modification determination, the totality of the circumstances must be considered." *A.M.L.*, 98 So. 3d at 1013 (¶24). "If an adverse substantial or material change is found, the chancellor must then perform an *Albright* analysis to determine whether modification of custody is in the child's best interest." *Strait*, 155 So. 3d at 203 (¶20).

¶39. In *Albright*, the Mississippi Supreme Court set forth a list of factors to guide the courts "in determining the child's best interests," namely:

> (1) age, health and sex of the child; (2) a determination of the parent that has had the continuity of care prior to the separation; (3) which has the best parenting skills and which has the willingness and capacity to provide primary child care; (4) the employment of the parent and responsibilities of that employment; (5) physical and mental health and age of the parents; (6) emotional ties of parent and child; (7) moral fitness of the parents; (8) the home, school and community record of the child; (9) the preference of the child at the age sufficient to express a preference by law; (10) stability of home environment and employment of each parent and other factors relevant to the parent-child relationship.

*Lee v. Lee*, 798 So. 2d 1284, 1288 (¶15) (Miss. 2001) (quoting *Albright*, 437 So. 2d at 1005). "When analyzing the best interest of the child for the purposes of custody modification, the chancellor must make on-the-record findings for each of the *Albright* factors." *Hendrix v. Whitt*, 373 So. 3d 778, 788 (¶35) (Miss. Ct. App. 2023).

¶40. Thus, when considering a request for child custody modification, the proper approach

13

is to first identify the specific material change in circumstances adverse to the child's best interest, followed by an analysis and application of "the *Albright* factors in light of that change." *Roberts v. Roberts*, 110 So. 3d 820, 830 (¶31) (Miss. Ct. App. 2013); *accord Briggs v. Weary*, 396 So. 3d 1246, 1255 (¶38) (Miss. Ct. App. 2024).

¶41. With respect to the custody modification in this case, the chancellor's July 2023 order provides:

> The Court finds that a material change in circumstances has occurred which adversely affects the minor child necessitating a change in custody . . . .
>
> IT IS . . . ORDERED AND ADJUDGED that this Court's prior orders are hereby modified, awarding [Randall] and [Meagan] joint legal custody of [G.D.P.]. . . . Both [Randall] and [Meagan] are responsible for making medical, education, and other decisions for [G.D.P.]

¶42. The chancellor addressed the basis for her custody modification in her bench ruling following the May 15, 2023 hearing, first recognizing that she must find that the party seeking a change in custody has "prove[d] that there was a substantial change in circumstance that has transpired since the entry of [the June 2021 agreed order]. That this change adversely affects the child's welfare and that the child's best interest is mandated by this change." The chancellor then ruled as follows:

> Randall asked the Court to modify the custody from sole legal and physical custody that was vested with . . . Meagan to the parties sharing joint legal custody. The Court is of the opinion that the parties should share legal custody of the minor child. It is a very strong hardship on a parent to find out that their child is in need of medical assistance or is in trouble for anything, and they not [have] the information they need to care and love for their child. A child needs both parents, not one. And for the Court to hear testimony that [Randall] appeared at the hospital but police, security or whomever were called on him to stand guard in the door of the hospital to keep him from loving and caring for his son to show his compassion, that's just unexplainable to the Court.

14

Now both parties will be responsible for making decisions regarding [G.D.P.'s] medical and education. And I see that there is a provision in [the June 2021 agreed order] . . . [t]hat Meagan shall list Randall on school applications, aftercare, summer care, camps, medical providers, sports, extracurricular activities as [G.D.P.'s] father and provide his correct telephone number, address and email address. That provision shall remain. However, now because [Randall] will have the joint legal custody, he will be able to share in the decision[-]making process regarding [G.D.P.].

Upon our review of the record, we find no other analysis or discussion of the chancellor's basis for her legal-custody-modification ruling.[5]

¶43. As an initial matter, we find that without further elaboration, it is unclear whether the chancellor's reliance on the hospital incident constitutes a sufficient basis supporting a determination that "a material change in circumstances has occurred since the entrance of the [last] custody decree," *Miller v. Boyd*, 72 So. 3d 577, 579 (¶9) (Miss. Ct. App. 2011), and if so, whether this change "adversely affected . . . [G.D.P.'s] welfare." *Thornell v. Thornell*, 860 So. 2d 1241, 1243 (¶¶7-8) (Miss. Ct. App. 2003).

¶44. In *Miller*, the chancery court granted Levi Miller and Sonya Boyd joint physical custody of their minor son and granted Sonya sole legal custody of the child. *Miller*, 72 So.

---

[5] Meagan asserts in her appellant's brief that "the [chancery court] did not sufficiently elaborate as to what material change in circumstances had occurred" to warrant a custody modification. Nevertheless, Meagan then speculates that "[i]n *guessing* as to what the [c]ourt found to be a substantial change in circumstances [so as to modify custody], it seems that the most likely case is that the [c]ourt made its decision based on interference with visitation." (Emphasis added).

We will not speculate on any additional grounds for the chancellor's custody modification order other than the ruling we have set forth above. Indeed, upon our own review of the record, we find no indication that the chancellor based her custody modification ruling on Meagan's interference with Randall's visitation. Rather, we find that Meagan's visitation interference, among other factors, served as the basis for the chancellor's *visitation* modification ruling, which we address in our discussion below.

15

3d at 578 (¶3). Levi subsequently "filed a petition for modification, requesting joint legal custody." *Id.* at (¶4). Levi asserted that his inability to make medical decisions on the child's behalf without Sonya's consent "caused [the child] to suffer." *Id.* Levi testified at the hearing on this issue that he was unable to obtain new medical prescriptions for the child without Sonya's consent. *Id.* at (¶10). In one instance, Sonya was unreachable when their child's allergist wanted to change the child's allergy medicine prescription. *Id.*

¶45. The chancery court ruled that this did not constitute a "material change in circumstances" sufficient to warrant modification of legal custody. *Id.* at (¶6). This Court found no error in the chancery court's ruling, pointing out that even though Levi required Sonya's consent in order for the child to obtain new medical prescriptions, there was no showing that the child "did not receive medical care because of Levi's lack of legal custody." *Id.* at 579 (¶¶10-11).

¶46. We acknowledge that as in *Miller*, no evidence in this case shows that G.D.P. was prevented from getting medical attention based on Randall's inability to make medical decisions for him, and Randall admits that Meagan had notified him that G.D.P. was in the hospital. But Randall also testified that he went to G.D.P.'s hospital room the next day because "[he] couldn't get direct answers on what was going on." According to Randall, Meagan interrupted his visit with G.D.P. and "[p]roceeded to tell me I was not welcome, that I needed to leave, that I couldn't be there." Meagan then asked for hospital security, and a police officer was posted at the door of G.D.P.'s hospital room. Randall testified that these circumstances were "just . . . too much for [G.D.P.]." To prevent further conflict, Randall

16

told G.D.P. he loved him and left.

¶47. Although these circumstances may constitute a material change in circumstances adverse to G.D.P.'s welfare, we are unable to determine the rationale based upon the chancellor's ruling—and we may not "attempt[] to guess what the chancellor determined was a proper basis for a change in custody." *Campbell v. Watts*, 192 So. 3d 317, 320 (¶13) (Miss. Ct. App. 2015). In modifying custody, the chancellor must identify "what the prior conditions were . . . and identify any changed circumstances with which to make a comparison," and then the chancellor must articulate how that change "adversely affected the welfare of the child." *Thornell*, 860 So. 2d at 1243 (¶¶7-8) (reversing and remanding custody modification ruling where chancellor "failed to first identify a specific change in circumstance that adversely affected the welfare of the child" prior to attempting an *Albright* analysis).

¶48. Further, even if the chancellor had properly addressed these two requirements, we are compelled to reverse the legal custody modification ruling because the chancellor did not conduct the requisite *Albright* analysis in determining whether a custody modification was in G.D.P.'s best interest. *Briggs*, 396 So. 3d at 1255 (¶38) (reversing and remanding chancellor's ruling that was essentially a change in custody, instructing the court to conduct further proceedings to determine whether there was a material change in circumstances adversely affecting the child and, if so, whether the change in custody served the child's best interest under *Albright*); *Roberts*, 110 So. 3d at 830 (¶31) (reversing and remanding chancellor's custody modification ruling where the chancellor's order lacked any analysis of

17

specific changes in circumstances or a discussion of the *Albright* factors); *see also Moreland v. Spears*, 368 So. 3d 333, 342 (¶¶31-32) (Miss. Ct. App. 2023), *cert. denied*, 368 So. 3d 813 (Miss. 2023) (employing *Albright* factors where legal custody, alone, was at issue).

¶49. For the reasons stated, we reverse the chancellor's ruling modifying G.D.P.'s legal custody and remand this matter for further proceedings on this issue. On remand, the chancellor must identify and articulate whether there was a material change in circumstances adversely affecting G.D.P., and, if so, the chancellor must apply the *Albright* factors in light of such change and determine whether a legal custody modification is in G.D.P.'s best interest.

## II. Visitation Modification[6]

¶50. Meagan asserts that the chancellor's visitation modification decision should be reversed because the chancellor "[f]ail[ed] to find that the established visitation order was not working" and "[f]ailed to find that the modification of visitation was in [G.D.P.'s] best interest." We disagree. In light of our deferential review of the chancellor's visitation decision, and based upon our careful review of the record, we find that substantial evidence supports the chancellor's visitation modification ruling. Accordingly, we affirm this decision for the reasons addressed below.

¶51. "Visitation is a matter within the chancellor's sound discretion." *Fortner v. Bratcher*,

---

[6] As noted, the chancellor modified Randall's summer visitation with G.D.P. from two weeks' visitation in June and July to summer visitation from June 1 through August 1 and granted Meagan one week with G.D.P. during that time beginning on G.D.P.'s July birthday. The chancellor also modified Randall's monthly visitation from one long weekend a month to weekend visitation on the first, third, and fifth weekends of each month.

394 So. 3d 452, 459 (¶31) (Miss. Ct. App. 2024) (quotation mark omitted). "The chancellor is charged with fashioning a visitation schedule that is in the best interests of the children, and the chancellor's visitation decision is afforded great deference by this Court." *Id.*

¶52. "To modify a visitation order, it must be shown that the prior decree for reasonable visitation is not working and that a modification is in the best interest of the child." *H.L.S. v. R.S.R.*, 949 So. 2d 794, 798 (¶9) (Miss. Ct. App. 2006). The "unworkability" factor may be met with evidence of the custodial parent's interference with the noncustodial parent's visitation and the parents' inability to get along. *Id.* at (¶11).

¶53. Meagan asserts that the chancellor applied an "incorrect legal standard" in modifying visitation because the chancellor did not specifically articulate the two-pronged standard used for visitation modification in the July 2023 order. To be sure, in modifying visitation, the chancellor did not articulate the proper test but, rather, found "that a material change in circumstances has occurred which adversely affects the minor child necessitating a . . . modification of visitation."[7] Nevertheless, as we discuss below, we find that the chancellor effectively applied the proper analysis, and the analysis is supported by substantial evidence. As such, we find no reversible error here. *See Thomas v. Thomas*, 281 So. 3d 1191, 1213 (¶79) (Miss. Ct. App. 2019).

¶54. Specifically, with respect to the first "unworkability" factor, our review of the hearing transcripts shows that the chancellor heard and considered ample evidence about Meagan's

---

[7] *See Haddon v. Haddon*, 806 So. 2d 1017, 1019 (¶12) (Miss. 2000); *H.L.S.*, 949 So. 2d at 798 (¶9) ("When modification of visitation is at issue, the material change in circumstances test is not applicable because the court is not being asked to modify the permanent custody of the child.").

interference with Randall's visitation and Randall's and Meagan's inability to get along, which are appropriate "unworkability" considerations. *See H.L.S.*, 949 So. 2d at 798 (¶11). Regarding the second "best interest" factor, we find that the chancellor considered and addressed G.D.P.'s best interest in modifying visitation and, indeed, found that modification was in G.D.P.'s best interest. More importantly, we find that substantial evidence supports the chancellor's visitation modification decision with respect to both factors; thus, "we cannot say that the chancellor clearly erred or abused her discretion" by modifying visitation in this case. *Thomas*, 281 So. 3d at 1213 (¶79).

¶55. In *Thomas*, we found no "clear[] err[or]" where the chancellor did not make specific findings of facts on an issue, but the record contained evidence sufficient to support the chancellor's ruling on that issue. *Id.* In so holding, we recognized that "when there are no specific findings of fact, this Court will assume that the trial court made determinations of fact sufficient to support its judgment." *Id.* (quoting *Century 21 Deep S. Props. Ltd. v. Corson*, 612 So. 2d 359, 367 (Miss. 1992)). In *Corson*, the supreme court further recognized that "where there are no specific findings of fact provided by the chancellor, this Court must look to the evidence and see what state of facts will justify the decree." *Corson*, 612 So. 2d at 367. We find ample evidence in the record supporting the chancellor's visitation modification decision. Accordingly, we affirm this decision, as we address in detail below.

### 1. *Unworkability of Prior Visitation Schedule*

¶56. As noted, in *H.L.S.*, this Court found that the "unworkability" factor is met where there is substantial evidence of the custodial parent's interference with visitation and the

parties' inability to get along. *Id.* at 798 (¶11). The circumstances in *H.L.S.* are very similar to those in this case. We find that our analysis there is wholly applicable here.

¶57. In that case, H.L.S. and R.S.R. had one child. *H.L.S.*, 949 So. 2d at 796 (¶2). The parties divorced, and the chancellor awarded the father (H.L.S.) full custody of the couple's daughter. *Id.* R.S.R., the child's mother, was awarded visitation as set forth in the divorce decree. *Id.* R.S.R. subsequently petitioned the chancery court to cite H.L.S. for contempt "for his failure to comply with the visitation schedule." *Id.* at 797 (¶4). She also sought to modify the visitation schedule. *Id.* The chancellor found H.L.S. in contempt for denying R.S.R. visitation, and modified the visitation schedule as R.S.R. requested. *Id.* at (¶6).

¶58. In affirming the chancellor's visitation modification ruling, we found that H.L.S.'s interference with R.S.R.'s visitation, coupled with testimony that the couple "did not work well together," constituted "substantial evidence that the [current] visitation provision [in the parties' divorce decree] was not working." *Id.* at 798 (¶11). We pointed out that H.L.S. himself admitted he denied R.S.R visitation with their child on a number of occasions, including preventing R.S.R. "from exercising her six-week summer visitation with [the child] during the summers of 2003 and 2004. . . . Furthermore, as H.L.S. concedes in his brief, '[t]here was ample testimony showing that the [parties] did not get along and did not work well together.'" *Id.* As such, we found "that the chancellor did not err in modifying the original visitation schedule [in that case]." *Id.*

¶59. Meagan attempts to distinguish *H.L.S.* from this case because the chancellor here did not specifically rule that visitation "was not working" but, instead, "only indicated that

21

visitation needed to resume."  We are not persuaded by Meagan's simplistic analysis.  In affirming the chancellor's visitation modification in *H.L.S.*, we did not point to a specific finding by the chancellor that the prior visitation agreement was not working.  Rather, we affirmed the chancellor's visitation modification decision because "substantial evidence" supported that the custodial parent interfered with visitation and the parties did not get along.  *Id.* at 798 (¶11).  That same analysis applies here.  As such, we find that Meagan's assertion to the contrary is without merit.

¶60.    Like the chancellor in *H.L.S.*, the chancellor here found Meagan in contempt for "withholding [G.D.P.] from visitation with his father."[8]  The chancellor specifically found that "[a]ccording to the testimony heard by the Court today, Randall has not been able to exercise his visitation with the minor child . . . since October 2022."  Substantial evidence supports this finding.  Indeed, in her own appellate brief, Meagan admits that it was *her* "interference and deviation from the original visitation schedule" that led to the "breakdown of Randall's visitation."  Randall and his parents likewise testified that Randall had not exercised visitation since October 2022.

¶61.    The chancellor also found Meagan in contempt "for not meeting and presenting [G.D.P.] at the agreed upon exchange location," noting Meagan herself testified that she told the Perrys that "until the parties could sit down and work out some ramifications, they were not going to see [G.D.P.]," though Meagan admitted that these "ramifications" were not part of the governing visitation provisions of the June 2021 agreed order.

---

[8] Meagan did not appeal the chancellor's contempt rulings against her.

22

¶62.    The chancellor's finding on this point is likewise supported by substantial evidence. Mr. Perry testified that after Meagan withheld visitation, she told the Perrys (Randall and his parents) that they would not see G.D.P. until they all had "a conversation . . . to discuss what we could and couldn't do as far as being around [G.D.P.]." Meagan admitted that she did insist that the Perrys have a conversation with her about how visitation with G.D.P. would take place before they would see G.D.P. again. Meagan likewise admitted that any such "conversation" prior to Randall having visitation with G.D.P. was not in the current visitation order.

¶63.    There is also substantial evidence that Meagan interfered with Randall's relationship with G.D.P. in various other ways, even before she withheld visitation, including the hospital incident we have addressed above. At the May 15, 2023 hearing, Randall, his parents, and Riseden also testified about other incidents where Meagan attempted to interfere with Randall's interaction with G.D.P. after football games, school functions, and other activities.

¶64.    The testimony about these incidents likewise shows that Randall and Meagan "did not get along." *H.L.S.*, 949 So. 2d at 798 (¶11). Further, Mr. Perry testified that he and his wife would pick up G.D.P. for visitation and take him back. They helped "because [Randall and Meagan] can't get along[—]arguing and fussing[—and] because [Randall] does not like confrontation."

¶65.    Despite the substantial evidence discussed above supporting the chancellor's visitation modification ruling under *H.L.S.*, Meagan contends in her appellant's brief that "[g]iven that the breakdown of Randall's visitation was due to interference and deviation from the original

visitation schedule *by Meagan*, the appropriate remedy would have been to enforce the original order rather than modify it." (Emphasis added). In short, Meagan relies on her own uncooperative behavior in contending that the chancellor should have enforced the original visitation order rather than modifying it.

¶66. As a matter of law, our decision in *H.L.S.* wholly undermines Meagan's contention. *H.L.S.* shows that the chancellor here appropriately modified visitation *because of* Meagan's interference with Randall's visitation with G.D.P. *See H.L.S.*, 949 So. 2d at 798 (¶11). As a matter of equity, Meagan's contention is equally untenable because she seeks to enforce the original visitation agreement based upon her own failure to comply with its terms. *See Saltwater Sportsman Outfitters LLC v. Miss. Dep't of Revenue*, 362 So. 3d 5, 11 (¶17) (Miss. 2023) ("The clean hands doctrine prevents a complaining party from obtaining equitable relief in court when he is guilty of willful misconduct in the transaction at issue."). Based upon the substantial evidence in the record regarding Meagan's interference with Randall's visitation with G.D.P. and the parties' inability to get along, we find that the "unworkability" factor of the visitation modification test is met in this case.

### 2. *G.D.P.'s Best Interest and the Rights of the Noncustodial Parent*

¶67. To modify visitation, the chancellor must first and foremost consider the child's best interest, while also bearing in mind the rights of the noncustodial parent. As this Court has explained, "[w]hen the chancellor determines visitation, he must keep the best interest of the child as his paramount concern while always being attentive to the rights of the non-custodial parent, recognizing the need to maintain a healthy, loving relationship between the

24

non-custodial parent and his child." *Ellis v. Ellis*, 840 So. 2d 806, 812 (¶24) (Miss. Ct. App. 2003) (quoting *Harrington v. Harrington*, 648 So. 2d 543, 545 (Miss. 1994)). "Mississippi law provides that a noncustodial parent is entitled to significant visitation with a child under circumstances that foster a close relationship." *Jaggers v. Magruder*, 129 So. 3d 965, 969 (¶21) (Miss. Ct. App. 2014). As such, "[v]isitation should be sufficient to create an environment conducive to developing as close and loving a relationship as possible between parent and child." *Id.* "This Court will not reverse a chancellor's findings of fact so long as they are supported by substantial evidence in the record." *Ellis*, 840 So. 2d at 812 (¶24).

¶68. In the May 15, 2023 bench ruling, after finding that Meagan had withheld Randall's visitation with G.D.P. since October 2022, the chancellor addressed her considerations regarding G.D.P.'s welfare and his relationship with Randall, the noncustodial parent. The chancellor, for example, pointed out that "[t]he Court did ask [Meagan during the hearing] if there were any concerns . . . regarding [G.D.P.] visiting with his father or being with his father." The chancellor found that "[e]ach time that the Court asked, the Court was told no. There are no concerns and no [G.D.P.] does not have to be brought to the Court to speak with the Court in chambers."

¶69. During the hearing, the chancellor questioned Meagan about her excessive calls to Randall while he had G.D.P. for visitation. Meagan testified that after Randall or his parents picked up G.D.P. for visitation, she (Meagan) would need to call "multiple times" because she did not know where her child was. In an effort to understand why Meagan was compelled to make these repeated calls, the chancellor asked Meagan whether, after G.D.P.

25

was picked up, did he go "with other people?" In other words, the chancellor was asking Meagan whether G.D.P. left with people other than Randall or his parents. Meagan testified, "Oh, no. He's with them." *Id.* After the chancellor questioned Meagan further, Meagan admitted that neither Randall nor his parents had harmed G.D.P. in any way.

¶70. The chancellor recognized this testimony in her bench ruling, as follows:

> [T]he Court went to great lengths to ask [Meagan] whether . . . the Perrys [(Randall and his parents)] . . . ever hurt [G.D.P.] in any way. And [Meagan] testified no, that the Perrys have never hurt [G.D.P.] in any way.[9]

The chancellor also noted Meagan's testimony that G.D.P. loved Randall and his grandfather, as follows: "Also, [Meagan] testified that [G.D.P.] does love his father and Paw-Paw [(G.D.P.'s paternal grandfather)] is his man."

¶71. Taking these considerations into account, as well as the law and the evidence before her, the chancellor modified Randall's visitation with G.D.P. and specifically found that it would be in G.D.P.'s best interest to do so, as follows:

> As such, the [c]ourt . . . wants the visitation to get back on track and the [c]ourt does find that there is a substantial change in circumstances that has occurred regarding this matter and that this has potentially affected [G.D.P.'s] welfare *and that it will be in his best interest that visitation get back on track. . . . So the* [c]*ourt will modify the visitation schedule as outlined*.

(Emphasis added).

---

[9] At a later point while issuing her bench ruling, the chancellor recognized Meagan's testimony regarding Randall's purported instability but again pointed out that "there was no testimony presented that [Randall] places the minor child in any type of danger." The chancellor recognized the testimony presented at trial that "[Randall] may drink a beer, but . . . there was no testimony that he drinks and drives with his minor children in the vehicle. And there was some testimony that he got arrested for being a public drunk inside of a hotel, but . . . [t]he charges did not proceed against him."

¶72. At the January 30, 2024 hearing on Meagan's motion for a new trial, the chancellor again articulated her reasoning for modifying Randall's visitation and her concern for G.D.P.'s welfare and Randall's rights as the noncustodial parent. The chancellor recalled the testimony and evidence from the May 15, 2023 hearing, as follows:

> The Court vividly remembers this case, mainly because, you know, there was a mother who was trying to control the visitation and who had pretty much hindered the father from visiting with his minor child. And when he was visiting with his minor child, she did everything in her power to frustrate it. In short, she's controlling. . . . And that was disheartening to see a father who wanted to do a lot of great things with his son, the things [Randall] . . . talked about in his direct testimony [and] [t]he grandparents['s testimony] . . . about how [Randall] took [G.D.P.] out in Holmes County to . . . the little summer camp park where they stay in a camper. He gets to go fishing. He gets to go hunting, turkey hunting. He gets to go to the Dixie Rodeo. He was in a commercial for the Dixie Rodeo with his father. And he [(G.D.P.)] looked to be really enjoying those activities. And those are activities that boys truly enjoy with their father. And to disrupt that in the manner in which she did was extremely disheartening.

As we have detailed above, there is substantial evidence in the record regarding Randall's loving relationship with G.D.P., the activities Randall and G.D.P. enjoyed together, and Randall's ability to care and provide for G.D.P.

¶73. The chancellor also explained to Meagan that

> my granting of full summer visitation to a non-custodial parent is in no way of me punishing a custodial parent. It is so that the children can enjoy an uninterrupted visitation with their non-custodial parent. That's all that is. But I have been . . . making sure that I give the custodial parents one week during the summer. And since [G.D.P.'s] . . . birthday is in the summer, it will be 6:00 p.m. on his birthday and you return the minor child to Mr. Perry by 6:00 p.m. the following week. That's how I'm modifying that.

¶74. The chancellor further reminded Meagan's counsel that her "client is not cut off from having any type of contact with the minor child. She will have her one phone call with the

minor child all summer long, her one phone call a day." However, the chancellor warned

Meagan and her counsel that it was unacceptable for

> [Meagan] to [constantly] call [G.D.P. during his visitation with Randall] and constantly pressur[e] [him] . . . trying to find out what he is doing and where he's doing it and why he's doing it, and then contacting a non-custodial parent [during that parent's visitation] when the laws are very clear that a non-custodial parent has . . . the say-so as to what's happening during those visitation periods.[10] And I'm taking this time to make myself very clear because if you-all come back, and I hear that the minor child . . . is not being able to spend time with his father . . . and his grandparents, that's going to be a big problem for your client.

¶75. As set forth above, no one disputed that Meagan withheld G.D.P. from visitation with Randall since October 2022. Testimony from the hearing also showed that after this time, when Randall tried to see G.D.P. after G.D.P.'s football games or school events, Meagan interfered with Randall being able to have any meaningful contact with him. And even before Meagan withheld visitation, there is substantial evidence that Meagan interfered with Randall's visitation with G.D.P. by incessantly calling G.D.P. when he was with Randall or the Perrys and that these constant calls were upsetting to G.D.P. Mrs. Perry testified, for example, that Meagan would call during visitation "[m]orning, noon, night, all in between," and this would "upset" G.D.P. When asked to describe what she meant by "upset," Mrs. Perry testified, "[G.D.P.'s] demeanor changes. His personality would switch from being happy to just not."

¶76. Despite the chancellor's careful consideration of G.D.P.'s best interest and the

---

[10] *See, e.g.*, *Moreland v. Spears*, 368 So. 3d 333, 344-45 (¶44) (Miss. Ct. App. 2023) (recognizing the general rule that "non-custodial parents are entitled to 'broad authority and discretion' with respect to the place and manner of their visitation") (quoting *Cox v. Moulds*, 490 So. 2d 866, 870 (Miss. 1986)), *cert. denied*, 368 So. 3d 813 (Miss. 2023).

corresponding need to foster and "maintain a healthy, loving relationship between [Randall] and his child," *Ellis*, 840 So. 2d at 812 (¶24), Meagan asserts that the chancellor's new visitation schedule is contrary to G.D.P.'s best interest. According to Meagan, the chancellor failed to consider how G.D.P.'s "prolonged separation" from her during his summer visitation with Randall would "impact . . . [G.D.P.'s] emotional and psychological well-being." We disagree.

¶77. As an initial matter, we observe that the chancellor reconsidered her summer visitation ruling and revised it by awarding Meagan a week of visitation during the month of July. This modification broke up the time G.D.P. was away from Meagan from eight weeks straight to four weeks in June and then three non-consecutive weeks in July. We also point out that G.D.P. was a ten-year-old boy when the chancellor modified visitation, not an infant or toddler, where mother-child separation issues may arguably be a consideration.[11] Further, in modifying visitation, the chancellor considered Meagan's own testimony acknowledging that G.D.P. loved his father and grandfather. The chancellor also noted all the activities Randall and G.D.P. did together and how "[G.D.P.] looked to be really enjoying those activities" in the photographs entered into evidence. For all these reasons, we find no clear or manifest error in the chancellor's findings on this point.

_____

[11] Generally speaking, the "tender years doctrine" applies in the child custody context, and even in that context, the supreme court has recognized that "this Court has significantly weakened the once strong presumption that a mother is generally best suited to raise a young child." *Lee*, 798 So. 2d at 1289 (¶17). Further, even if that doctrine were considered in the visitation context, this Court has recognized that children as young as four years old "may not be subject to the tender years doctrine." *Price v. McBeath*, 989 So. 2d 444, 454 (¶39) (Miss. Ct. App. 2008). G.D.P. was ten years old when the chancellor modified his visitation with Randall in this case.

¶78. Meagan also suggests that the chancellor ignored her (Meagan's) concerns about the stability of Randall's environment, including his past "job changes" and his residence. But as we discussed above, after extensive questioning by the chancellor, Meagan admitted she did not fear for G.D.P.'s safety when he was with Randall or his parents. As for Meagan's concerns about Randall's "job changes," the chancellor heard testimony from Randall, McMullan, and Mr. Perry that Randall is gainfully employed. Further, Randall's home is adjacent to his parents' home. Mr. Perry testified that in the event Randall is called into work during the night, G.D.P. would stay in his own bedroom at his grandparents' home.

¶79. As for Randall's living situation, Randall resides in the separate living quarters that are part of his horse trailer. These living quarters are fully equipped with a kitchen, bathroom, bed, and a sleeping area for G.D.P. Further, Randall testified he could provide for G.D.P.'s needs, and he has not and would not put G.D.P. in danger. Randall testified that he has not driven unsafely or been under the influence of drugs or alcohol around G.D.P. or any child. The witnesses testifying in Randall's behalf corroborated this testimony and bore witness that Randall was a caring and loving father to G.D.P. In short, we find that Meagan's contentions on this point are without merit.

¶80. For all the above-stated reasons, we find that Meagan's assertion that the chancellor's visitation modification decision should be reversed is without merit.

## CONCLUSION

¶81. The chancellor in this case modified G.D.P.'s legal custody from Meagan having sole legal custody to the parties sharing joint legal custody of the child. We reverse the

chancellor's July 2023 order modifying custody and remand this matter for further proceedings on this issue. In addressing this matter on remand, the chancellor shall identify and articulate in the ruling whether there was a material change in circumstances adversely affecting G.D.P., and, if so, the chancellor must apply the *Albright* factors in light of such change and determine whether a legal custody modification is in G.D.P.'s best interest.

¶82. In the July 2023 order, the chancellor also modified Randall's visitation with G.D.P. Following Meagan's request for a new trial, the chancellor modified Randall's summer visitation in that ruling to allow Meagan one week with G.D.P. in July. For the reasons stated above, we find that substantial evidence supports the chancellor's visitation modification decision. Accordingly, we affirm the March 2024 order.

¶83. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**BARNES, C.J., WILSON, P.J., McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. WESTBROOKS, J., NOT PARTICIPATING.**

31